**John MERRIAM**

v.

**Robert L. KUNZIG, Administrator, General Services Administration, et al.**

**Civ. A. No. 71–2262.**

United States District Court,
E. D. Pennsylvania.

June 26, 1972.

---

5. 369 U.S. at 217, 82 S.Ct. 691.

C. Clark Hodgson, Jr., Philadelphia, Pa. (Stradley, Ronon, Stevens & Young, Philadelphia, Pa., of counsel), for plaintiff.

Robert A. Prince, Asst. Gen. Counsel, Claims and Litigation Div., Gen. Services Administration, Washington, D. C., Louis C. Bechtle, U. S. Atty. E. D. Pa. by Warren D. Mulloy, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

## OPINION

HANNUM, District Judge.

On September 30, 1970, the defendant General Services Administration (hereafter, GSA) solicited bids for the lease of office space for several federal agencies located in the City of Philadelphia. On February 18, 1971 GSA awarded a 20 year lease to Gateway Center Corporation (hereafter, Gateway), the builder of a new office building yet to be constructed. The plaintiff, John W. Merriam (hereafter, plaintiff), is the owner of the Curtis Building, a twelve story office building located at Independence Square in Philadelphia. He,

as an unsuccessful offeror of office space, has filed the present action seeking, *inter alia,* a declaratory judgment that the award to Gateway was illegal, an injunction prohibiting the defendants from executing the lease contemplated by the award, and an order compelling GSA to reconsider those offers, other than Gateway's, that were responsive to the original solicitation. Presently before the Court is the defendant's motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., 28 U.S.C. To deal with the legal questions raised a detailed statement of the facts underlying this controversy is required.

## HISTORY OF THE CONTROVERSY

By Presidential directive dated March 27, 1969, the regional boundaries of the Department of Labor, Housing and Urban Development, Health, Education and Welfare, and the Office of Economic Opportunity were realigned in order to promote their efficiency and to improve their service to the general public. The City of Philadelphia was designated one of several regional headquarters for each of these agencies. GSA, charged with the responsibility of providing space for government agencies, implemented the Presidential mandate by adopting a policy requiring the realigned agencies to be headquartered in the same building where feasible. As a consequence of this policy and due to the lack of adequate government-owned office space, a need was created in Philadelphia for approximately 314,000 net useable square feet of office, storage, and related space.[1]

Following an effort to develop competition in the real estate market to supply the required space, GSA conducted a market survey between January 21 and January 28, 1970. During this interval, on January 25 and again on January 28, the Government's interest in acquiring the desired amount of space was advertised in an area newspaper, the Philadelphia Inquirer. Thereafter, thir-

1. Complaint, paras. 2, 6, 7; Parker Affidavit, Exhibit A.

ty-six persons or firms expressed an interest in supplying the Government's needs.[2]

On September 30, 1970, at the direction of A. F. Sampson, Commissioner of GSA's Public Buildings Service, Solicitation for Offers No. NEG (70)–63 was issued to the plaintiff and twenty-five other prospective offerors in the metropolitan area. In response to the solicitation a total of five offers, including the plaintiff's, were received. One bid was withdrawn and another determined to be nonresponsive. Consequently, only three bids remained for GSA's consideration, the plaintiff's, Gateway Center Corporation's, and a third, not relevant to the present controversy. On February 18, 1971, Robert L. Kunzig, Administrator of GSA, upon the recommendation of Commissioner Sampson, authorized the latter to make the presently disputed award to Gateway Center Corporation.[3] On February 19, 1971, plaintiff protested the award to the General Accounting Office (hereafter, GAO) which, on September 16, 1971, advised his counsel that it did not feel that it could rule authoritatively on the protest at that time.[4] The plaintiff filed this law suit on the same date.

On November 17, 1971, plaintiff moved for a preliminary injunction requesting that GSA be restrained from executing the Gateway lease and moved under Rule 57, Fed.R.Civ.P., 28 U.S.C., for a prompt hearing. On November 19, the defendants filed a motion for summary judgment which, in addition to seeking judgment as a matter of law, challenged the jurisdiction of this Court and the plaintiff's standing to sue. On November 23, the defendants filed answers to both of the plaintiff's motions and, in light of the jurisdictional issues raised by their motion for summary judgment, requested the Court to defer any hearing on the plaintiff's motions until the motion for summary judgment had been resolved. At a pre-trial conference on December 9, plaintiff withdrew his motion for a preliminary injunction upon the representation of the Government that no lease would be executed with Gateway until the construction of its building had been completed. Thereafter, on February 7, 1972, this Court stayed its hand for thirty days in order to allow the Comptroller General of GAO to rule on the merits of the plaintiff's protest and thereby provide the Court with the benefit of the GAO's expertise in the area of bid protests. See, M. Steinthal & Co. v. Seamans, 455 F.2d 1289 (D.C.Cir. 1971). On March 17, 1972, the Comptroller General issued his ruling.[5] Having the benefit of GAO's views, the Court must still resolve the questions of jurisdiction and standing raised by the defendants.

## NATURE OF THE CONTROVERSY

The administrator of GSA is empowered to enter into lease agreements necessary for the accommodation of federal agencies by virtue of Section 210 of the Federal Property and Administrative Services Act of 1949, as amended, 40 U. S.C. § 490(h)(1) (1970):

> "The Administrator is authorized to enter into lease agreements with any person, copartnership, corporation, or other public or private entity, which do not bind the Government for periods in excess of twenty years for each such lease agreement, on such terms as he deems to be in the interest of the United States and necessary for the accommodation of Federal agencies in buildings and improvements which are in existence or *to be erected by the lessor for such purposes* and to assign and reassign space therein to Federal agencies." (emphasis added)

Since 1963, annual appropriations for GSA's operations have contained the fol-

---

2. Motion for Summary Judgment, Sampson Affidavit.

3. Complaint, paras. 4, 5, 8; Motion for Summary Judgment, Sampson Affidavit.

4. Douglas M. Parker Affidavit, Exhibit E.

5. Appendix A to this Opinion.

lowing restriction with regard to payments to be made by GSA for the lease of buildings yet to be constructed by the lessor. The restriction first appeared in the Independent Offices Appropriation Act, 1963, Act of Oct. 3, 1962, P.L. 87–741, tit. I, 76 Stat. 728:

> "No part of any appropriation contained in this Act shall be used for the payment of rental or lease agreements for the accommodation of Federal agencies in buildings and improvements which are *to be erected by the lessor* for such agencies at an estimated cost of construction in excess of $200,000 or for the payment of the salary of any person who executes such a lease agreement: Provided, That the foregoing proviso shall not be applicable to projects for which a prospectus for the lease construction of space has been submitted to and approved by the appropriate Committees of Congress in the same manner as for public building construction projects pursuant to the Public Buildings Act of 1959." (Emphasis added)

During the period presently in controversy, essentially the same restriction appeared in both the Independent Offices and Department of Housing and Urban Development Appropriation Act, 1970, Act of Nov. 26, 1969, P.L. 91–126, tit. I, 83 Stat. 229, and the Independent Offices and Department of Housing and Urban Development Appropriation Act, 1971, Act of Dec. 17, 1970, P.L. 91–556, tit. I, 84 Stat. 1449 (hereafter, I.O.A. A.).

In April and May of 1964 informal discussions were held between representatives of the General Services Administration and the General Accounting Office in an effort to determine the impact of the foregoing restrictions upon the basic authority of the Administrator to enter into lease agreements for the accommodation of Federal agencies. GSA's purpose was to interpret the boundaries of the term "to be erected"

and thereby create workable criteria by which the restriction could be observed. These discussions gave birth to what have come to be known as the "5 conditions" which, when met by a lessor of a building "to be erected", have been interpreted by GSA to relieve it from the restrictive language of the Appropriation Acts. Should the lessor of a building to be constructed at a cost in excess of $200,000 certify its compliance with the five conditions, GSA would deem the building to be in existence already and thereby eliminate the need for Congressional approval of a prospectus. The five conditions required to be met by a lessor on the date of the issuance of an invitation for bids are satisfied if:

> "(i) Title to the site was vested in the bidder or the bidder possessed such other interest in and dominion and control over the site to enable starting construction;
>
> (ii) Design was complete;
>
> (iii) Construction financing fully committed;
>
> (iv) A building permit for construction of the entire building, extension or addition had been issued;
>
> (v) Actual construction is currently in progress or a firm construction contract with a fixed completion date has been entered into." [6]

These conditions were put into effect on May 15, 1964 by a memorandum from John W. Chapman, Assistant Commissioner for Space Management, to all Regional Administrators of GSA. As of that date they were designated for inclusion in all solicitations for bids where new construction was requested or permitted. In addition to having been included in the solicitation for bids involved in the present dispute, they have been included in thirty other solicitations issued by GSA since 1964.[7]

---

6. Motion for Summary Judgment, Shipp Affidavit.

7. *Id.*

In response to the solicitation issued in the case at bar, the plaintiff submitted a responsive offer of office space in a building that has been in existence for many years. The building offered by Gateway, however, was, and is, yet to be constructed. As planned, it will stand in the University City Science Center at 36th and Market Streets in Philadelphia and will be a modern fifteen story building providing fourteen consecutive floors of uniform office space. The cost of construction will be in excess of $10,600,000.

To certify its compliance with the "5 conditions" for being considered a building in existence, Gateway submitted with its offer the following documentation:

1. A lease from University City Science Center dated September 23, 1970, accompanied by letters from counsel for both Gateway Center Corporation and University City Science Center of the same date, stating that in their opinion the lease was a valid and binding instrument.[8]

2. Building plans and specifications.[9]

3. A letter from Allan C. Kirkman, Assistant Vice President of Provident National Bank, Philadelphia, Pa., dated September 15, 1970, committing the bank to provide a construction loan up to $12,000,000.[10]

4. A building permit issued by the City of Philadelphia Department of Licenses and Inspections dated September 30, 1970.[11]

5. A construction contract between Gateway Center Corporation and Rosemont Construction Corporation, dated September 30, 1970, for the construction of University City Gateway Building No. 1 at the Northeast corner of 36th and Market Streets, Philadelphia, Pa., per plans and specifications of Norwicki and Polillo, Architects, dated September 14, 1970.[12]

In Count I of plaintiff's Complaint it is contended that GSA's acceptance of Gateway's offer was illegal because it violated the requirements of the I.O.A. A. of 1970, and that the defendants Kunzig, Sampson, and Shipp acted arbitrarily, capriciously, and unlawfully because they were instrumental in its acceptance. Specifically, it is averred that the acceptance of an offer to construct a fifteen story building costing in excess of ten million dollars and in which federal agencies will be the sole tenants, required the submission of a lease prospectus to Congress and its prior approval.

In Count II of the Complaint the defendants are charged with arbitrarily and unlawfully interpreting the "which are to be erected by the lessor" language of the I.O.A.A. by prescribing the "5 conditions" and substituting these conditions for the statute they purport to interpret. It is averred that the defendants were not authorized to interpret the I.O.A.A., and that it constitutes a firm congressional mandate restricting GSA's authority to enter into lease agreements for the accommodation of federal agencies. The plaintiff contends that under the I.O.A.A. it was GSA's duty to determine whether or not Gateway intended to build a building independent of the prospect of a government lease, and that GSA failed to perform this duty.

Count III, which is stated in the alternative, accepts *arguendo* the proposition that the defendants were authorized to use the "5 conditions" as a valid statutory interpretation of the I.O.A.A. Nonetheless, it is alleged that the defendants were derelict in their duty by accepting, without investigating, Gateway's representations. It is averred that Gateway made representations in the offer, in-

8. Motion for Summary Judgment, Sampson Affidavit, Attachment 2

9. *Id.*, Attachment 3

10. *Id.*, Attachment 4

11. *Id.*, Attachment 5

12. *Id.*, Attachment 6

cluding the documentation submitted in support thereof, purportedly certifying that the offer complied with the five conditions of the solicitation, whereas, in truth, such representations were false and intentionally misleading.

SUBJECT MATTER JURISDICTION

■ The first question to be dealt with in this controversy is whether federal jurisdiction exists. In his complaint, the plaintiff has alleged that the matter in controversy exceeds $10,000, exclusive of interest and costs. He has invoked federal jurisdiction on the basis of title 28 U.S.C. § 1331 (federal question), § 1361 (mandamus), §§ 2201, 2202 (declaratory judgment), title 41 U.S.C. § 11 (limitation on public contracts), and title 5 U.S.C. § 702 (§ 10 of the Administrative Procedure Act). Because 28 U.S.C. § 1331 definitely provides federal jurisdiction in the present case, there is no need to resolve the open question in this Circuit as to whether § 10 of the APA provides an independent source of jurisdiction in federal courts for review of agency action.

> Title 28 U.S.C. § 1331(a) provides: "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

Crucial to the determination of whether federal jurisdiction exists under § 1331 in the present case are the questions of whether the matter in controversy exceeds $10,000, exclusive of interest and costs, and whether the controversy "arises under" a law of the United States.

There can be no doubt that the plaintiff has satisfied the jurisdictional amount requirement. He claims that GSA's action has caused him to suffer the loss of a prospective beneficial business relationship with the Government. Further, he claims a right to protect that prospective relationship by having GSA's allegedly illegal award to Gateway set aside. Should such a right exist, it would renew the plaintiff's prospect of a business relationship with the Government which would involve an annual amount in excess of $2,000,000. Although the value of the prospective business relationship sought to be protected by the plaintiff would not equal the amount of the lease at stake, it certainly has a value in excess of $10,000 for jurisdictional purposes.

■ Similarly, there can be no doubt that the present controversy "arises under" a law of the United States. The basis for the plaintiff's suit, for which the plaintiff claims a right of redress under the APA, is GSA's asserted violation of the I.O.A.A. of 1970. Central to the plaintiff's claim is a judicial construction of the I.O.A.A. Whether or not the plaintiff is the proper party to redress GSA's possible violation of a federal law requires a determination of his standing to sue. Whether or not the plaintiff has stated a cause of action upon which relief can be granted requires a judgment on the merits. However, for a federal court to have jurisdiction, and therefore the power to enter a judgment upon the merits, it is sufficient that the plaintiff plead a right to recovery or redress directly involving a controversy respecting the construction or effect of a law of the United States. Gully v. First Nat. Bank in Meridian, 299 U.S. 109, 114, 57 S.Ct. 96, 81 L.Ed. 70 (1936). Inasmuch as a direct violation of a federal law has been pleaded in the present case, and since the claim does not appear immaterial to the law pleaded or "wholly insubstantial and frivolous", this Court has jurisdiction over the subject matter of the present litigation. Bell v. Hood, 327 U.S. 678, 682–683, 66 S.Ct. 773, 90 L.Ed. 939 (1946); State of Delaware v. Pa. N.Y. Cent. Trans. Co., 323 F.Supp. 487, 493–495 (D.Del.1971); Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238, 240 n. 1 (M.D.Pa.1970); A. G. Schoonmaker Co. v. Resor, 319 F. Supp. 933, 940 (D.D.C.1970).

## STANDING

As this case has developed, the most difficult question facing this Court has been the determination of the plaintiff's standing to sue.

 In general, the question of whether a party has standing to sue is the question of whether he has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972). "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Like the justiciability of the issues sought to be adjudicated, questions of standing must be determined within the framework of Article III which restricts federal judicial power to "cases" and "controversies". Flast v. Cohen, *supra*; Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 151, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). As was stated in Sierra Club v. Morton, *supra*, 92 S.Ct. 1364–1365:

"Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a 'personal stake in the outcome of the controversy,' Baker v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663], as to ensure that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' Flast v. Cohen, 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed. 2d 947]. Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a deter-

mination of whether the statute in question authorizes review at the behest of the plaintiff."

In *Sierra Club*, a membership corporation composed of conservationists sought a declaratory judgment and injunction to restrain the United States Forest Service and the Department of the Interior from granting approval or issuing permits for the building of a recreational development, aspects of which allegedly violated federal laws governing the preservation of national parks, forests, and game refuges. The Sierra Club sought judicial review relying upon § 10 of the Administrative Procedure Act (APA), 5 U.S.C. § 702. The plaintiff in the present case proceeds on the same basis.

To determine a plaintiff's standing to initiate review under § 10 of the APA, the Supreme Court referred to its analysis of the same question in the companion cases of Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184, and Barlow v. Collins, 397 U. S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). There, two important criteria were set forth when the Court held:

". . . that persons had standing to obtain judicial review of federal agency action under § 10 of the APA where they had alleged that the challenged action had caused them 'injury in fact,' and where the alleged injury was to an interest 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies were claimed to have violated." 92 S.Ct. at 1365.

Under the facts of the present case, the plaintiff has little difficulty in meeting the first criteria set forth in *Data Processing* and reiterated in *Sierra Club*. The plaintiff has alleged that the loss of a prospective beneficial business relationship has caused him irreparable damage. In each count of the complaint he alleges that he is "aggrieved and palpably injured" by the defendants' allegedly illegal action. From the facts in

this case, there can be little doubt that the plaintiff has suffered the "injury in fact" necessary to provide standing to initiate review under § 10 of the APA.

The plaintiff, however, encounters greater difficulty in demonstrating that he comes within the second criteria, that the interest he seeks to protect is "arguably within the zone of interests to be protected or regulated" by the statute claimed to have been violated by the defendants.

To determine the zone of interests to be protected by the I.O.A.A. requires analysis of its legislative history. The language requiring GSA to submit a prospectus to Congress prior to entering into a lease construction contract for a building costing more than $200,000 first appeared in the I.O.A.A. of 1963. The purpose for the restriction is set forth in the report from the Committee on Appropriations, H.R.Rep.No.2050, 87th Cong., 2d Sess. 13 (1962). The relevant language reads:

> "The General Services Administration wants to build several new buildings in the District of Columbia under a lease construction program to provide 1 million square feet of additional space. The entire space in each building is to be rented by the Government. With this procedure the Committee disagrees since they are completely financed new buildings under lease construction contracts. The Committee believes that the Government should own the buildings instead of giving somebody a ten to fifteen year payout. The concern of the Committee is that lease construction is clearly the most expensive method of providing Government space. Under this method the Government pays rent at $4 to $4.25 per square foot per year and never obtains title to the property. A limitation on use of funds for lease construction projects costing over $200,000 has therefore been included

in the bill, but it provides that a project may proceed after obtaining legislative approval in advance of a commitment in the same manner as for public building construction projects financed by direct appropriations pursuant to the Public Buildings Act of 1959."

From the foregoing, it is apparent that, by enacting the restrictive provisions of the Act, Congress was solely concerned with achieving economy in Federal spending. The very fact that this restriction has repeatedly appeared in annual appropriation legislation, rather than in an amendment to the basic leasing authority of the Administrator serves to reenforce this view. That which is to be both protected and regulated is the Federal budget. The interests to be protected are those of the Government and of the general public in minimizing governmental expenditures. The question then, is whether the specific interest sought to be protected by the plaintiff falls "arguably" within this zone.

The specific interest of the plaintiff as it appears in the complaint is stated to be:

> ". . . that the offers which were responsive on the date the bid period closed be considered for the award and that it be made in accordance with applicable federal statutes . . . . [T]he interest [asserted] is the same as any bidder possesses in public contract cases: an interest in having the government, in its business dealings with the public, proceed according to law." [13]

The plaintiff concedes that his specific interest is not among the interests sought to be protected by the I.O.A.A.[14] But he argues that he has standing to protect the public interest as a "private attorney general", and that, as such, the "zone of interests" requirement of Data Processing should be liberally construed

---

13. Plaintiff's Supplemental Brief, 21–22

14. In his brief he states, "Can this Court find the plaintiff's interest specifically identified in the statute or legislative history; certainly not." Plaintiff's Supplemental Brief, 23.

"to enable any plaintiff to 'argue' that he has an interest protected or regulated within a given statute".[15] In support of this proposition the plaintiff advances a recent line of cases from the District of Columbia commencing with Scanwell Laboratories, Inc. v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859 (1970).

*Scanwell* involved a bid protest similar to the present. The Federal Aviation Administration had issued an invitation for bids on instrument landing systems to be installed at airports. Scanwell Laboratories was an unsuccessful bidder who had submitted the second lowest bid. Because the lowest bidder had allegedly failed to comply in all respects with the invitation for bids, Scanwell filed suit to have its acceptance set aside claiming that the FAA's award of the contract to an allegedly non-responsive bidder was arbitrary, capricious, and a violation of the statutory provisions controlling government contracts. Judicial review was sought on the basis of § 10 of the APA. Although the district court had dismissed the suit for lack of standing, the District of Columbia Circuit reversed, holding that Scanwell had standing to sue as a "private attorney general":

> "Thus the essential thrust of appellant's claim on the merits is to satisfy the public interest in having agencies follow the regulations which control government contracting. The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, *but the suit itself is brought in the public interest by one acting essentially as a 'private attorney general.'*" 424 F.2d 859, 864 (emphasis added)

The "private attorney general" doctrine developed during a period in which standing was held to be lacking unless the interest sought to be protected constituted "a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege". Tennessee Electric Power Co. v. TVA, 306 U.S. 118, 137–138, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939); Perkins v. Lukens Steel Co., 310 U.S. 113, 125, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). The concept was designated to permit those with less than recognized legal rights to establish an otherwise lacking "case" or "controversy" by acting as private attorneys general to vindicate the interest of the public in preventing unlawful agency action. It was first employed in Associated Industries of New York State v. Ickes, 134 F.2d 694 (2 Cir. 1943), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), where an association of coal consumers sought to challenge an order of the National Bituminous Coal Commission increasing the minimum prices of coal. Judge Frank advanced the theory to reconcile two previous decisions of the Supreme Court, FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S. Ct. 693, 84 L.Ed. 869 (1940), and Scripps-Howard Radio v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), with the "legal right" doctrine. In *Sanders* and *Scripps-Howard*, radio stations suffering increased competition as a result of FCC action were granted standing on the basis of § 402(b) (2) of the Communications Act[16] which provided review for persons "aggrieved" or "adversely affected" by decisions of the Commission. In *Associated Industries*, Judge Frank granted standing on the basis that the petitioners were persons "aggrieved" within the meaning of the review provision in the Bituminous Coal Act of 1937:[17]

> ". . . Congress can constitutionally enact a statute conferring on any non-official person, or on a designated

---

15. *Id.*, at 17

16. Act of June 19, 1934, c. 652, tit. IV, § 402(b)(2), 48 Stat. 1093.

17. Act of April 26, 1937, c. 127, § 6(b), 50 Stat. 85.

group of non-official persons, authority to bring a suit to prevent action by an officer in violation of his statutory powers; for then . . . there is an actual controversy, and there is nothing constitutionally prohibiting Congress from empowering any person, official or not, to institute a proceeding involving such a controversy, even if the sole purpose is to vindicate the public interest. Such persons, so authorized, are, so to speak, private Attorney Generals.

* * * If, then, one is a 'person aggrieved,' he has authority by review proceedings under § 6(b), to vindicate the public interest involved in a violation of the Act . . . , even if he can show no past or threatened invasion of any private legally protected substantive interest of his own." 134 F.2d 694, 704–705.

*Scanwell* was decided when the weight of adverse commentary and decisional law was pressing for the abandonment of the legal right doctrine in government contract cases. After analysis of its legislative history, it was held that Congress had intended to incorporate the private attorney general concept into the Administrative Procedure Act. As a result, it was held that the APA provides standing to any person "in fact aggrieved" by agency action. In so holding, the court rejected the legal right doctrine and reduced the requirements for standing to the minimum necessary to provide a constitutional "case"

or "controversy". In *Data Processing*, however, decided less than one month later, the Supreme Court did not go as far. In requiring complainants to demonstrate "injury in fact" it, too, rejected the legal right doctrine, but it added the non-constitutional requirement that the interest sought to be protected by the complainant be arguably within the zone of interests to be protected or regulated by the statute claimed to have been violated. It is clear that the Scanwell decision did not include, and therefore did not consider, this requirement.

The District of Columbia Circuit may have been correct in its analysis of the APA's legislative history. But assuming that it was, it is impossible to assume further that the Supreme Court intended the private attorney general concept "arguably" to supply the interest necessary to meet the "zone of interests" requirement. That requirement is inherently restrictive. It is antithetical to the private attorney general concept which would apply to any plaintiff who challenged an agency's violation of any statute. If, in *Data Processing*, the Supreme Court intended to permit any person injured in fact to have standing as a private attorney general under the APA, then the zone of interests requirement would have been surplusage and never imposed. Consequently, there is little basis for accepting the plaintiff's contention that the *Scanwell* decision placed him "arguably" within the zone of interests necessary to confer standing.[18] Be-

18. The cases decided after Scanwell and Data Processing do not alter this conclusion. In Ballerina Pen Company v. Kunzig, 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970), *Data Processing* was followed and the interest sought to be protected by the plaintiff was held to be arguably within the zone of interests sought to be protected by the Wagner-O'Day Act. In Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.App. D.C. 31, 433 F.2d 1137 (1970), however, the court only restated the requirements of *Data Processing*, applying in fact the requirements of *Scanwell*. In A. G. Schoonmaker Co., Inc. v. Resor, 319 F. Supp. 933 (D.D.C.1970), *Data Processing*

was not considered and *Scanwell* was followed without analysis. In Shannon v. United States Dept. of Housing and Urban Dev., 436 F.2d 809 (3 Cir. 1970), the interest sought to be protected by the plaintiff was held to be arguably within the zone of interests to be protected by the Housing Act of 1949. In American Standard, Inc. v. Laird, 326 F.Supp. 492 (D.D.C.1971), *Data Processing* was not considered and *Scanwell* was followed without analysis. In Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), no question of standing was raised. And in National Helium Corp v. Morton, 326 F.Supp. 151 (D.Kan.1971),

cause the specific interest of the plaintiff cannot reasonably be considered to be included in the zone of interests to be protected or regulated by either the I.O. A.A. of 1970 or 1971, this Court is forced to conclude . that the plaintiff lacks standing to sue and that his complaint must be dismissed.

My decision is compelled by the present state of the law, yet considering the nature of the remedy available to the plaintiff had he standing and were he to prove his case, his present status may simply be an advancement of the inevitable. He concedes that this Court is not empowered to make a contract for him. His remedy, at best, would be to have the award to Gateway set aside. Such action suggests one of two results: that the Government be compelled to award a lease to either the plaintiff or the other remaining responsive offeror, or, that the Government be compelled to resolicit bids altogether. If the latter course of action were adopted, the additional question would be raised as to whether Gateway should be excluded from further competition.

The wholesale exclusion of Gateway in either case would have to be weighed against the public interest in having the federal socio-economic agencies housed in a location which would provide optimal impact for the services to be provided and in a structure that would facilitate the highest interdepartmental efficiency.

The present record reflects major differences between the location and building offered by Gateway and those offered by the two other responsive bidders.[19] Of considerable significance is the high preference accorded the Gateway location by all Federal, State, and local agencies consulted.[20] It is clear that were Gateway to be excluded to vindicate one public interest, it would be done so only at the expense of another.

In its decision not to object to GSA's action, GAO suggests that nothing beneficial would be accomplished by upsetting the present award in order to satisfy the plaintiff's asserted right to reconsideration.[21] The positive aspects of the Gateway project are manifest. If there has been harm in GSA's action, it has been harm in the method, not in the result.

M. Steinthal & Co. v. Seamans, 455 F.2d 1289 (D.C.Cir.1971), and Wheelabrator Corp. v. Chafee, 455 F.2d 1306 (D.C.Cir. 1971), *Data Processing* was ·not considered and *Scanwell* was followed without further analysis.

Not all courts have overlooked the conflict between *Scanwell* and *Data Processing*. See, e. g., Gary Aircraft Corp. v. Seamans, 342 F.Supp. 473 (W.D.Tex. May 8, 1972) which, to the extent that it applies the *Data Processing* zone of interest requirement, is adopted by this Court.

19. See Appendix B, Commissioner Sampson's recommendation of February 18, 1971, infra, pp. 738 to 739.

20. *Id.*, pp. 740 to 741.

21. Appendix A, infra, pp. 734 to 735.

# APPENDIX A

COMPTROLLER GENERAL OF THE UNITED STATES

WASHINGTON, D.C. 20548

B-171958 MAR 17 1972

Dear Mr. Kreger:

By letter dated February 11, 1972, the Assistant Attorney General, Land and Natural Resources Division, Department of Justice, forwarded a copy of the court's order of February 7, 1972, staying action in the case of John W. Merriam v. Kunzig, et al., United States District Court, Eastern District of Pennsylvania, Civil Action No. 71-2262, pending receipt of our decision on a protest covering the same subject matter initially filed with our Office by the plaintiff.

The matter presently before the court was initially brought to our attention by telegram of February 19, 1971, from Richard B. Herman and Company, agent for John W. Merriam (Merriam), which questioned generally the propriety of the negotiation of a lease by the General Services Administration (GSA), acting on behalf of the United States, with Gateway Center Corporation (Gateway) under solicitation for offers No. GSA(70)-63. By letter dated April 12, 1971, with enclosures, your General Counsel furnished our Office an administrative report outlining the circumstances involved. By letter with enclosures dated May 20, 1971, Lankler and Parker, counsel for Merriam for purposes of its protest before our Office, responded to the administrative report. As a result of counsel's reply, we requested a further report from GSA. By letter, with enclosures, dated July 9, 1971, we received a reply from your General Counsel and this supplemental report was made available to Merriam's counsel for comment. By letter received in our Office on July 22, 1971, counsel responded. Further submissions were also received from Merriam's counsel by letters dated August 25, 27 and September 10, 1971.

By letter dated September 16, 1971, we advised Merriam's counsel that we could not authoritatively rule at the time on the basic question presented by the protest, namely, whether Gateway met the criteria established by GSA for the purpose of assuring compliance with the limitation in the Independent Offices Appropriation Act of 1970 (Public Law 91-556), which, in effect, precludes the lease of new construction unless such construction has already been committed as a private venture. This action was taken in view of the fact that we were still in the process of reviewing GSA's lease construction practices, with particular emphasis on its implementation of the appropriation limitation. Merriam was advised, however, that we would consider the protest in the context of our report to the Congress. We were also cognizant of the fact that Merriam would institute court proceedings in the event of our declination to rule.

Our review is now complete and our report to the Congress will be released in the next few weeks. In view of the court's request for a specific ruling by our Office on the merits of Merriam's contention that the award to Gateway violates the Appropriation Act limitation and in consonance with the principles recently articulated in The Wheelabrator Corporation v. Chafee, et al., _____ F. 2d _____ (D.C. Cir. Nos. 24,705 and 24,729, October 14, 1971), and M. Steinthal & Co., Inc. v. Seamans, et al., _____ F. 2d _____ (D.C. Cir. No. 24,595, October 14, 1971), we have considered the facts surrounding the Merriam protest independent of the report. In our view, two separate inquiries are involved. First, there is question as to the meaning and application of the Appropriation Act limitation and, second, there is question as to the impact of the five criteria on competitive aspects of the procurement, that is, the rights of contending offerors during the negotiation of a lease contract.

With respect to the first question, the statutory limitation on the use of appropriations for lease construction programs was first included in the Independent Offices Appropriations Act of 1963, Public Law 87-741, 76 Stat. 728. In explaining the proposed statutory limitation, the House Committee on Appropriations stated:

> "The General Services Administration wants to build several new buildings in the District of Columbia under a lease construction program to provide 1 million square feet of additional space. The entire space in each building is to be rented by the Government. With this procedure the Committee disagrees since they are completely financed new buildings under lease construction contracts. The Committee believes that the Government should own the buildings instead of giving somebody a ten to fifteen year payout.

> "The concern of the Committee is that lease construction is clearly the most expensive method of providing Government space. Under this method the Government * * * never obtains title to the property. A limitation on use of funds for lease construction projects costing over $200,000 has therefore been included in the bill * * *."
> H. Rept. No. 2050, 87th Cong., 2d sess., at page 13.

In presenting its views to Subcommittee on Independent Offices of the House Committee on Appropriations in connection with the 1964 appropriations, GSA requested deletion of the restrictive provision. GSA suggested that the limitation was inconsistent with the program it considered

necessary to meet the office space requirements of the Government. In rejecting GSA's request, the chairman of the subcommittee stated:

> "I am afraid the GSA misinterpreted the language. The language was intended absolutely to forbid the leasing of that space under your jurisdiction, and requiring of you to come to the proper committees for authorization. Your language is quite weak. The reason you want this deleted is that you do not want to come back to Congress every year for your funds and authorization. In that regard, you are no different from any other agency that wants back-door authority."

We believe the statutory limitation and its legislative history evidence a strong congressional policy against lease construction programs. Although this policy is directed primarily against GSA, as opposed to a particular class of prospective lessors, the basic thrust of any implementation of the Appropriation Act limitation in the case of new construction must be to assure that only construction already committed as a private venture is offered to the Government for rental. In our view, the underlying question which any administrative implementation of the limitation must seek to resolve is whether there is a bona fide intention on the part of the offeror to construct the building offered for lease irrespective of its securing a lease with GSA. If this is the basic question, as we believe it is, then the fact that an offered building is not actually in existence is not decisive.

The five criteria are designed to provide objective assurance—that a particular offeror intends to go forward with his building irrespective of executing a lease with the Government—and this is their only purpose. The practical effect of meeting the criteria is to create a presumption overriding the appropriation restriction against leasing space to be erected for the Government. Compliance must be judged on the basis of the circumstances existing at the time of issuance of the solicitation for offers.

As noted by GSA in its submissions to the court, discussions were held between representatives of our Office and GSA prior to GSA's determination to rely upon the five criteria. We did not object to use of the criteria because we could not say that their adoption and proper enforcement would not adequately insure compliance with the Appropriation Act limitation. We remain of that view.

A basic question, then, is whether there has been bona fide compliance with each of the five criteria in this case, and we turn to a consideration of the specific circumstances involved.

Solicitation NEG(70)-63 was issued on September 30, 1970, for the leasing of 314,000 net usable square feet of office, storage and related space to be ready for possession by July 1, 1972. The lease is to be for a period of 20 years beginning on the date the space is accepted for Government occupancy with the right reserved to the Government to renew the lease for two additional 5-year periods.

The subject solicitation contained the following provisions:

"12. SPECIAL CONDITIONS RELATING TO BUILDING TO BE ERECTED BY BIDDER.

"a. Requirement. Each year since 1963 the following provision has been included in the Independent Offices Appropriations Act:

> "'No part of any appropriation contained in this Act shall be used for the payment of rental on lease agreements for the accommodation of Federal agencies in buildings and improvements which are to be erected by the lessor for such agencies at an estimated cost of construction in excess of $200,000 or for the payment of the salary of any person who executes such a lease agreement: Provided, That the foregoing proviso shall not be applicable to projects for which a prospectus for the lease construction of space has been submitted to the Congress and approval made in the same manner as for the public buildings construction projects pursuant to the Public Buildings Act of 1959.'

"b. Buildings and Improvements to be Erected or Altered. In the event a bidder offers (1) a new building to be erected, or (2) an existing building to be extended or added to (see c(2)(c), below) such bid shall remain open for acceptance by the Government for 120 days beyond the date for bid acceptance elsewhere specified in this solicitation, in order to afford the Government adequate time to prepare and submit to the appropriate Committees of Congress for approval, the prospectus required by the Act quoted in a, above.

**"c. Definition of Existing Buildings, Extension,
and Additions.**

"(1) For the purpose of this solicitation,
buildings, extensions or additions 'which are to be
erected by the lessor' do not include:

"(a) Buildings, extensions, or additions,
construction of which is substantially completed prior to
date of the solicitation.

"(b) New buildings, or extensions of and
additions to existing buildings the construction status of
which, on the date of issuance of the solicitation, met all
of the following conditions:

"i. Title to the site was vested in
the offeror or he possessed such other interest in and
dominion and control over the site to enable starting
construction.

"ii. Design was complete.

"iii. Construction financing fully committed.

"iv. A building permit for construction of
the entire building, extension or addition had been issued.

"v. Actual construction is currently in
progress or a firm construction contract with a fixed comple-
tion date has been entered into." (Emphasis added.)

Gateway submitted the following documentation to the contracting
officer to establish that its offered building was within the exception
of paragraph c(1)(b):

1. A lease dated September 23, 1970, between University City
Science Center, landlord, and Gateway, as tenant, for a term of 50 years,
with an option to purchase. Opinions of counsel as to the validity of
the lease.

2. A letter from the Provident National Bank, Philadelphia,
Pennsylvania, dated September 15, 1970, approving a construction loan
to the extent of $12,000,000.

3. Building permits issued by the city of Philadelphia.

4. A construction contract dated September 30, 1970, between Gateway and Rosemont Construction Corporation.

5. Drawings to demonstrate the design of the building had been completed.

Since this documentation satisfied the contracting officer that Gateway met the five criteria set out in the solicitation, Gateway was included in the negotiations conducted with Merriam and two other sources. Ultimately, Gateway's offer was accepted on February 18, 1971.

It is Merriam's position that the award to Gateway contravenes the Independent Offices Appropriation Act of 1970 (Public Law 91-556) because the documentation submitted by Gateway does not demonstrate that it fulfilled the five criteria on September 30, 1970, the date of issuance of the request for offers.

With respect to the question whether Gateway possessed "such * * * interest in and dominion and control over the site to enable starting construction," as required by the first criterion, Merriam points out that paragraph 25 of the lease between University City Science Center and Gateway expressly provides that it was made pursuant to a certain redevelopment contract dated November 26, 1955, between the Science Center and the Redevelopment Authority, the terms of which are to be binding on the tenant. In the referenced agreement between the Redevelopment Authority of the City of Philadelphia (Authority) and the Science Center, the Authority agrees to transfer title to the subject property to the Center subject to certain conditions binding on the Center and any transferree thereof. Paragraph 14 of this agreement provides:

> "The REDEVELOPER or its nominee shall not sell, lease or otherwise transfer the Project area, or Project, or any part thereof, without the prior written consent of the AUTHORITY until the AUTHORITY shall have certified in writing that the Redevelopment Project has been completed."

Paragraph 18 of the agreement provides:

> "The REDEVELOPER or its nominee shall submit to the AUTHORITY for its review and approval all necessary final plans, designs, and specifications for the development of

the Project area, including architectural and landscaping drawings. The REDEVELOPER or its nominee shall not commence any work pursuant to such plans, designs or specifications until approval by the AUTHORITY is made in writing; however, if no written communication is made by the AUTHORITY within thirty (30) days after such submission, AUTHORITY approval is inferred, unless the AUTHORITY requests an additional thirty (30) days for approval. Such approval shall not be unreasonably withheld."

In support of its position that the requisite approval had not been given as of the date of solicitation issuance, Herriam submitted a letter dated March 19, 1971, to a city councilman from the Executive Director of the Authority. The letter states in pertinent part:

"In response to your March 18 inquiry, please be advised that the Redevelopment Authority has approved no lease between the Science Center and Gateway Center Corporation for the above site.

"Preliminary plans for the proposed building on the site were approved in August, 1970. Final working drawings of the building have not yet been submitted for our approval. These plans must be submitted before construction can commence."

A letter dated April 20, 1971, between the same two persons states that while the Science Center has requested the Authority's approval of Gateway, the required documentation had not as of that date been furnished. Another letter dated September 28, 1970, from the Authority to the Center states that Gateway is accepted as the Center's nominee subject, however, to several conditions such as formal approval by the Authority and the Department of Housing and Urban Development. The record before our Office fails to show that the required approvals were granted as of the date the solicitation was issued.

Your General Counsel's position in reply is that the approvals have no bearing on the efficacy of the lease and notes that Gateway had taken steps to secure the needed approvals, citing as an example the approval of the preliminary building plans in August of 1970. The point, however, is that in the absence of the Authority's approval of the "final plans, designs, and specifications" pursuant to paragraph 18 of the redevelopment contract between the Authority and University City Science Center, it is

difficult to understand how it can be said under any reasonable inter-pretation of the circumstances and the language of the first criterion that Gateway's interest on September 30, 1970, was such as would "enable starting construction."

While failure to meet the first criterion is, in itself, a sufficient basis to support Merriam's position, we note that documentation submitted by Gateway to show compliance with the fifth criterion is also subject to question. We may agree that the construction contract between Gateway and Rosemont Construction Corporation literally complies with the require-ment that there be a "firm construction contract with a fixed completion date." However, Merriam's contention that Rosemont Construction Corpora-tion is controlled by the same individual who controls Gateway and that, subsequent to award, Rosemont entered into a joint venture with a firm with the capacity to perform the work--a capacity which Rosemont allegedly did not have--certainly raises question as to whether Gateway complied with the spirit of the criterion. This question is not, in our opinion, adequately answered by your General Counsel's advice in his letter of July 9 that Gateway complies with the criterion since actual construction is currently in progress. The issue is whether Gateway complied with the criterion at the time of issuance of the solicitation for offers.

We might add that if the case turned solely on the propriety of GSA's determination that Gateway complied with the third and fourth cri-teria, we would be inclined to deny Merriam's protest. Insofar as the requirement of the third criterion that financing be fully committed is concerned, the letter dated September 15, 1970, from the Provident National Bank recites that:

"This letter represents our agreement to provide a construction loan up to a maximum of $12,000,000 * * * subject to the execution of our usual construction loan documentation prior to closing. The interest rate shall be set at market level at the time of closing."

We cannot say that GSA's position that this letter satisfies the require-ment that construction financing be fully committed is unreasonable, for there is no indication that the commitment is subject to a material con-dition, such as Gateway obtaining a lease with GSA.

With respect to the fourth criterion, the question whether Gateway possessed a building permit for construction of the "entire" building involves an interpretative issue and GSA notes in this regard that three

permits were issued to Gateway prior to September 30 by the City of
Philadelphia Department of Licenses & Inspections for over $12,000
in permit fees. While Merriam urges that Gateway lacked permits for
air conditioning, plumbing and electrical work, there is, as GSA points
out, no indication that the basic permit is for less than an entire
building. More important, in our view, is the following observation
in your General Counsel's letter of July 9, 1971, with which we agree:

> "* * * Whether the word 'entire' means 'completed' in the
> sense of total, final construction is a matter of semantics.
> GSA does not require the latter which is not only impractical
> but virtually impossible since in order to meet the SFO
> /solicitation for offers requirements,/ changes, even in
> building design, might be required.

> "All that is required is that a permit has been issued for
> the building offered. * * *"

The clear implication of Merriam's position with respect to GSA's
determination that Gateway complied with the five criteria, particularly
insofar as the first and fifth criteria are concerned, is that a reason-
able attempt to verify or assess the adequacy of the documentation sub-
mitted was not made. From the record before us, we must agree. The
attitude of GSA is also reflected in its treatment of the requirement of
the second criterion that the design be "complete." From the record, it
appears to us that GSA considered that this requirement was complied with
by virtue of the approval of the preliminary plans by the Authority in
August of 1970, the bank commitment and the issuance of building permits
by the city of Philadelphia. This conclusion appears to be bolstered by
your General Counsel's advice that the drawings were submitted by Gateway
only for the purpose of aiding the contracting officer in evaluating the
space in terms of potential use, layout, etc. This interpretation fails,
in effect, to accord any independent meaning to the second criterion.

We should add at this point that by letter dated February 17, 1972,
Merriam's counsel submitted for our consideration certain depositions
and affidavits (which we understand are part of the record before the
court). We also received a further letter dated February 28, 1972, from
counsel, forwarding a copy of University City Science Center's deed to the
property. While we believe that reliance on this additional documentation
is unnecessary to support our conclusion, we have examined the documenta-
tion and find nothing therein which would detract from Merriam's position.

We recognize that since GSA is charged with the primary responsibility for insuring compliance with the Appropriation Act limitation, its interpretations concerning application of the criteria in any given case must be accorded great weight. Its determination if reasonable should stand notwithstanding that an alternative approach might appear to be more reasonable. We have expressed our opinion in light of this standard. To sustain GSA's determination here, we would have to say that it was under no duty to conduct a reasonable and independent examination of a particular offeror's compliance with the criteria, including when necessary a request for additional information to resolve reasonable doubts about compliance. Such a conclusion would sanction a complete evasion of the Appropriation Act limitation.

We come now to the competitive aspects of the procurement. Although it is our opinion that the agreement to lease is improper by reason of Gateway's noncompliance with some of the criteria as of the date specified, it does not follow that Gateway must be excluded from any resolicitation of the requirement, as Merriam urges. While noncompliance with the criteria implementing the Appropriation Act limitation at the date of issuance of a particular solicitation for offers may be decisive as to the eligibility of a particular prospective lessor to participate in those negotiations, we do not believe this alone would preclude that proposer from participating in future negotiations. Elimination of Gateway from future participation would relate to the competitive aspects of GSA's lease procurements--namely, the right of interested sources to compete equally for lease awards. As we indicated, this question is separate from an inquiry relating to the appropriation restriction. Insofar as the latter question is concerned, we find nothing in the limitation itself which would bar an offeror such as Gateway from future participation. See B-153036, September 2, 1964, wherein we expressed no objection to the subsequent execution of a new lease with an offeror who did not comply with the limitation at the time the original lease was executed.

From the competitive standpoint, it has long been our position that the Government has the duty to secure maximum competition in its procurements. The rights of prospective offerors to exclude other sources from any competition are clearly subordinate to the Government's obligation to secure maximum competition. Moreover, in this context, as Merriam's counsel recognizes in his letter of March 7, 1972, the elimination of Gateway from further participation would require a determination that Gateway was not a responsible prospective contractor because of a lack of integrity.

We cannot ignore the fact that Gateway has made substantial construction progress in reliance on GSA's assurance that it complied with the Appropriation Act limitation. Merriam would have us disregard the equities in favor of Gateway stemming from reliance upon determinations made by GSA. Merriam urges that if Gateway had truly intended to construct a building irrespective of executing a Government lease, there is no real harm done to Gateway in concluding that its lease with GSA is invalid for having failed to comply with solicitation requirements.

Moreover, we believe that the issues posed by this case are broader than the isolated circumstances of a single lease transaction. GSA's implementation of the appropriation restriction compliance criteria in the instant case is not unique, as our report to the Congress will demonstrate, and there is substantial likelihood that numerous other lessors are similarly situated. Thus, the magnitude and seriousness of the problem created by GSA's administration of the criteria leads us to conclude that the appropriate course of action for our Office is to draw the entire matter to the attention of the Congress for its consideration and possible corrective legislative action.

In light of the above conclusions we do not propose to initiate any question (in the context of the issues discussed herein) with respect to payments under existing leases. However, we must advise that we have no alternative to raising objection to payments under any lease executed after the date of this decision without proper regard for the restriction against leasing buildings to be erected for the Government, where the restriction is operative both at the time of lease execution and at the time of payment.

Sincerely yours,

R. F. Keller

Deputy Comptroller General
of the United States

The Honorable Roderick F. Kreger
Acting Administrator
General Services Administration

# APPENDIX B

UNITED STATES OF AMERICA
## GENERAL SERVICES ADMINISTRATION

DATE: FEB 1 1971

*Public Buildings Service*
*Washington, D.C. 20405*

REPLY TO
ATTN OF: Commissioner, Public Buildings Service - P

SUBJECT: Consolidation - Socio-Economic Agencies, Philadelphia, Pennsylvania

Mr. Robert L. Kunzig
The Administrator - A

In March 1969, President Nixon, so as to enhance the efficiency and effectiveness of the Federal human resources programs and to improve service to the general public, directed that common regional boundaries and headquarters for the regional offices of the various Federal agencies be established. It was determined by the Office of Management and Budget that the regional activities of the Departments of HUD, HEW, Labor and the OEO should be collocated in the new regional headquarters cities. Philadelphia was designated as one of the headquarters cities.

A. Implementation of the Directive to Collocate the Socio-Economic Agencies.

In the absence of sufficient Government-owned space in which to collocate the socio-economic agencies in Philadelphia, it is necessary to acquire by lease approximately 314,000 net usable square feet of space for this program.

 a. Procedure.

 (1) Market Survey. The projected space requirement for the collocation was advertised in the Philadelphia Inquirer on 1/23/70 and 1/25/70, and a market survey was conducted during the period 1/21 through 1/28/70. On March 3, 1970, market survey questionnaire letters were distributed to 36 entrepreneurs who had manifested an interest in supplying the required space.

 (2) Solicitation for Offers. On September 30, 1970, Solicitation for Offers NEG(70)-63 was issued to 26 prospective offerors. The solicitation called for 314,000 square feet, with a minimum of 20,000 square feet of office space per floor on contiguous floors, located within the city of Philadelphia, for a firm term of 20 years, to be delivered July 1, 1972. Award factors include those specified in Executive Order 11512. A requirement for an

*Keep Freedom in Your Future With U.S. Savings Bonds*

affirmative action plan to ensure equal employment opportunity was made a special condition of the solicitation.

(3) Receipt of Offers and Negotiations. Initial offers for 5 locations were received and ultimately negotiated to the final offered price.

| | OFFEROR | LOCATION | INITIAL PRICE/SQ FT | FINAL |
|---|---|---|---|---|
| 1. | Gateway Centre Corp. | Gateway Building #1, NE Corner, 36th & Market Streets | $8.90 | $7.67 ($2,316,000 per year) |
| 2. | 401 N. Broad Street Corp. | 401 N. Broad Street | $6.17 | $5.604 ($1,700,000 per year) |
| 3. | Binswanger Corp. | Bourse Building, 21 S. 5th Street | $7.56 | Withdrew |
| | Binswanger Corp. | Ford-Philco Plant, 4700 Wissahickon Ave. | $7.14 | $5.10 ($1,905,980 per year) |
| 4. | Richard B. Herman & Co. | Curtis Building, 6th & 7th & Walnut & Juniper Streets | $6.38 | $7.09 ($2,173,562 per year) |

(4) Compilation of Data on Award Factors. In order to comply with criteria established in Executive Order 11512, appropriate Federal, State, and local agencies were consulted about the prospective impact of the offered locations on the social and economic development of the community. Visits were made to the Philadelphia Planning Commission, Philadelphia Bicentennial Corporation, and other affected public and private agencies. The Secretaries of Commerce, HEW, and HUD were requested to provide representation on an ad hoc committee to advise with respect to the factors set forth in the executive order, and those agencies were asked to advise us as to the comparative merits of each of the proposed locations. A city task force on intergovernmental cooperation was also formed under the chairmanship of Philadelphia Mayor James H. J. Tate to evaluate the sites offered under the terms of the Intergovernmental Cooperation Act and OMB Circular A-95. The information and data obtained were related to the proposed sites by field inspection.

B. Evaluation of Offers.

a. Responsiveness to Solicitation and Economy Act. The offers submitted for Gateway Building #1, 401 N. Broad, and the Curtis Building are responsive to the requirements and specifications of the solicitation. The offer for the Bourse Building was withdrawn by the offeror. The offer for the Philco-Ford Plant was not responsive because the offeror will not accept the escalation provisions as required, nor firmly commit to deliver the required space by July 1, 1972.

All of the above responsive offers are within the appraised fair rental values and Economy Act limitations.

b. Space Utilization.

(1) Gateway Building #1. This building is located in the University City Science Center. It is a new modern, 15-story office building, rectangular in shape, measuring 200' x 120', serviced by a centrally located core area with high speed elevators. The building will provide 14 consecutive office floors of 20,000 square feet each with uniform configuration. Its interior column spacing is on uniform 24'6" centers with exterior window space on a 3'6" module. Its design, configuration, and column spacing will assure an efficient layout, effective utilization of the space, and a continuing high degree of flexibility for space changes over the 20-year firm term of the proposed lease.

(2) 401 N. Broad Street. This building was constructed in 1930 for semi-industrial and storage purposes with related office space. It is rectangular in shape, measuring 225' x 525', and contains approximately 1,000,000 square feet. Floors 6 to 11, offered to the Government, are "U" shaped, divided by a light well.

The Federal agencies presently occupying the building have been dissatisfied, over an extended period of time, with the building's elevators, airconditioning, heating and restroom facilities. Although the owner can improve upon some of these deficiencies in accordance with the specifications of our lease solicitation, it will not be possible to entirely correct the functional obsolescence of the building's mechanical systems. In these circumstances, it can be expected that agency dissatisfaction will continue to some extent, with an attendant drop in morale and agency efficiency.

Several other characteristics of the building preclude optimum space utilization and functional space layout. The building

has large circular columns and column spacing varies at several locations within the building. There is no standard module. Mechanical shafts are located throughout the space as opposed to being confined to a central core.. The extended distance from the primary corridors requires an extensive secondary corridor system. Finally, of the seven floors offered, only two floors are offered in their entirety. Various sized sections of the other five floors are offered and will result in the inefficient splitting of functional agency components to fit the space available.

In summary, the design of the building, the built-in functional obsolescence, and the adverse layout characteristics will not produce effective space utilization and optimum operational efficiency in agency activities.

(3) Curtis Building. This building, constructed about 1916, was designed for a combination of heavy industry and manufacturing use with some related office space. The building is rectangular in shape, approximately 230' x 375', and contains approximately 1,000,000 square feet. It is divided into 4 basic areas each served by freight and passenger elevators. Accessibility is restricted between areas because of a central light court and the scattered placement of fire stairs, elevators and mechanical areas. The column spacing is irregular (13, 18, and 20 feet) with varied column spacings from floor to floor and within floors. On the 10th and 11th floors, both of which have been offered for lease, there are variations in elevations, requiring ramp or stair access. The office space will contain a relatively high proportion of interior windowless space. The configuration of the building would necessitate an extensive corridor system to provide appropriate access to all of the operational units of the agencies to be accommodated and will not produce an efficient space layout. Thus, the effective cost of the space actually utilized for office purposes will be increased above that which would prevail in a building designed for office purposes.

C. Summary of Advice Regarding Locations.

1. Gateway Building #1. The City Task Force on Intergovernmental Cooperation ranked this site as being the best. The Department of Health, Education, and Welfare, after a detailed analysis, rated this site the highest. The Department of Commerce also preferred this site, indicating it offers the best location for the programs administered by the agencies and, because of its convenience to nearby neighborhoods, offers opportunities for hiring and training of disadvantaged people.

2. **401 North Broad Street.** None of the advising agencies rated this location as their first choice. This location is not as conveniently located as the Gateway Building #1 with respect to educational and training facilities needed to adequately support the agencies being housed. Additionally, the acquisition of this location would have a very limited positive impact on the local goals of the renewal programs in the city of Philadelphia.

3. **Curtis Building.** Those advising agencies which provided a priority listing of the various sites did not rate this location as the preferred site for the collocation. Overall, the acquisition of space at this location would not have any positive effect on ongoing Federal programs for the development and/or redevelopment of the city of Philadelphia.

## D. Analysis and Findings

Executive Order 11512 requires selection of the offer which will achieve the optimum blending and benefit in terms of the stated criteria set forth in the Order. One of the primary factors is attaining the maximum impact of the Federal monies being expended in direct or assisted programs in the community.

Each of the three locations responsive to the requirements and specifications of the solicitation have been analyzed with respect to meeting the criteria of the Executive Order and the advice received from other Federal and city agencies concerned. The Gateway Building #1 is the first choice of the city, HEW, Commerce and DHUD.

The City's Task Force made a comprehensive analysis of the sites under consideration and ranks the Gateway Building as the strongly preferred location by a considerable margin. The Task Force has also indicated that this building is in complete conformance with the local goals of the renewal programs in the city of Philadelphia.

In summary, there is a definite preference on the part of the concerned governmental organizations for the Gateway Building #1 location. Detailed support for the selection of this location is evidenced by the following:

a. <u>Housing</u>. A survey of employee domicile was conducted of all Federal employees involved with the collocation move. This survey found that approximately 72 percent of all employees in grades 1 to 6 live within the city of Philadelphia. The Gateway Building #1 site is readily accessible from all areas of the city.

A large supply of low and moderate income housing has been provided through the city's Housing Authority and the quasi-public Philadelphia Housing Development Corporation. Some 15,000 units of this housing supply are located in the nearby Center City, Lower North, and West Philadelphia areas. In addition to these city efforts, the West Philadelphia Corporation, which is composed of the University of Pennsylvania, Drexel Institute, Presbyterian Hospital and other similar institutions, has sponsored the redevelopment of low cost housing in proximity to the University City Science Center.

b. <u>Transportation</u>. The Gateway Building #1 is located in an area with excellent transportation facilities by several modes which provide good accessibility for agency employees and clients. Subway service is available at the nearby 34th Street Station. There are several bus lines and street car routes operating on the streets adjacent to or within easy walking distance of Gateway Building #1. This location is in proximity to the 30th Street Commuter Rail Station and the planned through-rail connection to Penn Center Station and the Reading Terminal. There is good accessibility, via the Schuylkill Expressway and the planned Schuylkill Expressway Bypass, to the freeway system serving the general area. There are several arterial streets serving the area and the impact of traffic generated by this facility will be minimal. Parking facilities are planned as a part of the development of the University City Science Center.

c. <u>Community Facilities</u>. The central location and excellent transportation facilities serving this site make the Gateway Building #1 readily accessible to a wide array of community facilities within the city of Philadelphia. The location is particularly convenient to institutions of higher learning including the University of Pennsylvania, Drexel Institute, and the Franklin Institute. These institutions offer exceptional opportunities for employee training and for Government research.

d. Impact on Neighborhood. The impact of this complex on the nearby community in West Philadelphia will be extremely beneficial. A survey of the socio-economic problems within Philadelphia has shown the areas immediately north and west of the University City Science Center have some of the most severe problems of low family income, unemployment, and educational attainment. The selection of this site will expand the impact of approximately $18,600,000 in Federal funds which have been expended to assist in the redevelopment and revitalization of this area. The occupancy of this building will reinforce the beneficial impact the construction of the Food and Drug laboratory building on Market Street, west of 38th Street, will have on the neighborhood; and serve as a catalyst to accelerate the development of the University City Science Center.

e. Conformity to Existing Plans. The Gateway Building #1 site and the University City Science Center complex has been officially designated by the city of Philadelphia as a redevelopment area. Full community participation was obtained in the planning process prior to the city's approval.

f. Coordination with Local, State and Federal Officials. Mayor Tate's Task Force expressed his city's strong support of the Gateway Building #1 over the other possible sites. Many other prominent citizens of the city, including the Executive Vice-President of the Greater Philadelphia Chamber of Commerce and the Chairman of the Board of the Philadelphia Bicentennial Corporation, expressed similar support for this site. Governor Milton J. Shapp and former Governor Raymond P. Shafer both have indicated that the State supports the Gateway Building #1 site. Senators Hugh Scott and Richard S. Schweiker have strongly backed the collocation move to this site. The socio-economic impact of this site selection was also carefully reviewed with appropriate officials of the Departments of Commerce, HEW and DHUD, and they have indicated a preference for the Gateway Building #1 location.

E. Conclusions and Recommendation.

Three responsive offers have been received. The offer by the owners of the Gateway Building #1 exceeds the offer of space in the Curtis Building by $.58 per square foot or approximately $142,000 per year, and the offer of space at 401 North Broad Street by $2.07 per square foot or $616,000 per year. The

Government, through the local redevelopment authority, has invested $18,600,000 in the University City Science Center. Development of this center is lagging, and the community is not realizing any return from the Federal funds which have been committed. The acquisition of space in the Gateway Building #1 will expand the impact of these funds and secure for the community the benefits envisaged at the time of those expenditures. Such action will also secure for the Government modern, first-class office space which will provide for optimum operational efficiency on the part of the agencies to be housed. The acquisition of space through acceptance of the third highest offer is in accordance with the objectives and aims of Executive Order 11512 and the requirements of the Federal Property and Administrative Services Act of 1949, as amended. Therefore, it is recommended that the Gateway Building #1 be selected for the collocation of the Federal socio-economic agencies in Philadelphia, and that I be authorized to proceed with the award of the lease contract.

A. F. Sampson
Commissioner
Public Buildings Service

APPROVED:

_____
The Administrator