**John W. MERRIAM, Appellant,**

v.

**Robert L. KUNZIG, Administrator, General Services Administration et al.**

**No. 72–1686.**

United States Court of Appeals, Third Circuit.

Argued Dec. 7, 1972.

Decided Feb. 16, 1973.

As Amended April 13, 1973.

Rehearing Denied April 27, 1973.

Kent Frizzell, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Carl J. Malone, U. S. Atty., Warren D. Mulloy, Asst. U. S. Atty., Philadelphia, Pa., Robert A. Prince, Asst. Gen. Counsel, General Services Administration, George R. Hyde, Rembert A. Gaddy, Anthony Borwick, Eva R. Datz, Attys., Dept. of Justice, Washington, D. C., for appellees.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

### OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from an order of the district court dismissing the complaint of appellant Merriam on defendants' motion for summary judgment for lack of standing. Merriam is one of two unsuccessful bidders on a solicitation for bids to furnish leasehold office space to the General Services Administration (GSA). That agency and several of its officials are defendants. Merriam seeks to have set aside an award made by GSA to Gateway Center Corporation (Gateway) for a twenty year lease of a new office building to be constructed in Philadelphia, and to have enjoined the execution of the proposed lease.

GSA's Solicitation for Offers for leasehold space was issued on September 30, 1970, to Merriam, to Gateway and to twenty-four other prospective offerors in the Philadelphia metropolitan area. Five bids were received. One was withdrawn and another was determined to be nonresponsive. On February 18, 1971, the Administrator of GSA authorized the making of the disputed award to Gateway. On February 19, 1971, Merriam, pursuant to 4 C.F.R. §§ 20.1–20.12 (1972), protested the award to the General Accounting Office, which on September 16, 1971, advised him through counsel that it could not rule authoritatively on the protest at that time.[1] As

C. Clark Hodgson, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellant.

1. The General Accounting Office regulations respecting bid protests did not at the time contain time limitations for the filing of protests, the submission of comments by the agency involved, or the ruling by the Comptroller General. These defects were remedied by new regulations issued at 36 Fed.Reg. 24791 (Dec. 23, 1971) ef-

soon as he was so advised Merriam commenced this lawsuit. On November 17, 1971, he moved for a preliminary injunction restraining the GSA from executing a lease pending determination of the cause, and, pursuant to Rule 57, Fed.R. Civ.P., for a prompt hearing. The government defendants made a cross motion for summary judgment, raising, among others, the issue of Merriam's standing to sue. They also requested that the court defer decision on Merriam's motions until the standing issue was resolved. This, of course, would have left GSA free *pendente lite* to execute the disputed lease. At a pretrial conference on December 9, 1971, however, Merriam withdrew his motion for a preliminary injunction on the representation of the Government that no lease would be executed with Gateway until the construction of the proposed building had been completed. The district court soon thereafter stayed all proceedings. On February 7, 1972, over Merriam's objection, it entered an order which provided in part:

" . . . because the defendant has advised the Court that the General Accounting Office is reviewing its lease construction practices, including the present bid protest, it is hereby ORDERED that the Court will stay its hand for 30 days pending receipt of the results of such review."

The General Accounting Office review was not completed until March 17, 1972. In the meantime Gateway's building was under construction, but no lease had been executed. The March 17, 1972 ruling by the Deputy Comptroller General of the United States was to the effect that the award to Gateway was improper in several respects to which more specific reference will be made hereafter,

but that because Gateway had made substantial construction progress in reliance on GSA's assurance that it had complied with the governing law, the Comptroller General would not initiate any question

" . . . with respect to payments under existing leases. However, we must advise that we have no alternative to raising objection to payments under any lease executed after the date of this decision without proper regard for the restriction against leasing buildings to be erected for the Government, where the restriction is operative both at the time of lease execution and at the time of payment."

The quoted language of the March 17, 1972 ruling may be understood in the context of the next preceding paragraph of the ruling, which explained that GSA's improper leasing practices were not confined to the isolated circumstances of a single lease transaction, and that the magnitude and seriousness of the problem created by GSA's administration of its leasing program required that the entire matter be referred to Congress for possible corrective legislative action. Thus, the General Accounting Office position seems to have been (1) that the award to Gateway was illegal, (2) that it would not challenge payments under existing leases, and (3) that as to leases not yet in existence it recognized that Congress could authorize future payments even though the award may have been improper. The ruling does not disclose whether the General Accounting Office was aware of the actual Gateway-GSA situation; that is, that the Government had represented that it would not execute a lease until the building was complete, and no lease had yet been executed.

fective January 23, 1972. *See* 4 C.F.R. §§ 20.1–20.12. The new regulations also provide:

"§ 20.4. Withholding of award.

When notice is given the agency that a protest has been filed with the General Accounting Office, award shall not be made prior to a ruling on the protest by the Comptroller General, unless

there has first been furnished to the General Accounting Office a written finding by the head of the agency, his deputy, or an Assistant Secretary (or equivalent), specifying the factors which will not permit a delay in the award until issuance of a ruling by the Comptroller General."

The March 17, 1972 ruling was brought to the attention of the district court by stipulation. It then took up and granted the Government's motion for summary judgment, 347 F.Supp. 713, on the ground that Merriam lacked standing, as an unsuccessful bidder, to challenge an illegal award. This appeal followed.

### Merriam's Legal Contention

The Solicitation by GSA was made under the authority of the Federal Property and Administrative Services Act of 1949, as amended, 40 U.S.C. § 490(h)(1):

> "The Administrator is authorized to enter into lease agreements . . . which do not bind the Government for periods in excess of twenty years . . . on such terms as he deems to be in the interest of the United States and necessary for the accommodation of Federal agencies in buildings and improvements which are in existence or to be erected by the lessor for such purposes. . . ."

This general leasing authority is limited, however, by a statute, 41 U.S.C. § 11(a), applicable to all public contracts:

> "No contract or purchase on behalf of the United States shall be made, unless the same is authorized by law or is under an appropriation adequate to its fulfillment. . . ."

Merriam contends that the leasing authority of GSA has, since 1963, been further limited by provisions reenacted annually.[2] The statute in effect on September 30, 1970, was the Independent Offices Appropriations Act, 1971, Pub.L. No. 91–556, 84 Stat. 1442, which provides:

> "No part of any appropriation contained in this Act shall be used for the payment of rental on lease agreements for the accommodation of Federal agencies in buildings and improvements which are to be erected by the lessor for such agencies at an estimated cost of construction in excess of $200,000 or for the payment of the salary of any person who executes such a lease agreement: *Provided,* That the foregoing proviso shall not be applicable to projects for which a prospectus for the lease construction of space has been submitted to the Congress and approval made in the same manner as for public buildings construction projects pursuant to the Public Buildings Act of 1959 [40 U.S. C. §§ 601–15]."

In preparing the Solicitation which resulted in the disputed award, GSA recognized that it was bound by the quoted provision of the Independent Offices Appropriations Act, 1971, the obvious purpose of which was to prevent without prior congressional approval the financing of new building construction on the credit of the United States by the use of government leases.[3] In the Solicitation

2. Independent Offices Appropriations Act, 1963, 1964, 1965, 1966, 1967, 1968, 1969, 1970, 1971; Pub.L. No. 87–741, 76 Stat. 716; Pub.L. No. 88–215, 77 Stat. 425; Pub.L. No. 88–507, 78 Stat. 640; Pub. L. No. 89–128, 79 Stat. 520; Pub.L. No. 89–555, 80 Stat. 663; Pub.L. No. 90–121, 81 Stat. 341; Pub.L. No. 90–550, 82 Stat. 937; Pub.L. No. 91–126, 83 Stat. 221; Pub.L. No. 91–556, 84 Stat. 1442.

3. Explaining the purpose of the lease construction provision in the Independent Offices Appropriations Act, 1963, Pub.L. No. 87–741, 76 Stat. 716, where it first appeared, the House Appropriations Committee said:

> "The General Services Administration wants to build several new buildings in the District of Columbia under a lease construction program to provide 1 million square feet of additional space. The entire space in each building is to be rented by the Government. With this procedure the Committee disagrees since they are completely financed new buildings under lease construction contracts. The Committee believes that the Government should own the buildings instead of giving somebody a ten to fifteen year payout.
>
> The concern of the Committee is that lease construction is clearly the most expensive method of providing Government space. Under this method the Government . . . never obtains title to the property. A limitation on use of funds for lease construction

GSA made reference to the fact that each year since 1963 the lease construction prohibition had appeared in the Independent Offices Appropriations Act. It provided that if the bid were for a building to be erected by the lessor the bid must remain open for an additional 120 days beyond that normally specified to afford the Government adequate time to obtain congressional approval. It then provided:

"(1) For the purpose of this solicitation, buildings . . . 'which are to be erected by the lessor' do not include:

(b) New buildings . . . the construction status of which, on the date of issuance of the solicitation, met all of the following conditions:

i. Title to the site was vested in the offeror or he possessed such other interest in and dominion and control over the site to enable starting construction.

ii. Design was complete.

iii. Construction financing fully committed.

iv. A building permit for construction of the entire building, extension or addition had been issued.

v. Actual construction is currently in progress or a firm construction contract with a fixed completion date has been entered into."

It is undisputed that at the time of the solicitation the Gateway site was a vacant lot in an urban renewal area in the city of Philadelphia, and that the proposed Gateway lease was never submitted to Congress.

Merriam's complaint alleges (1) that Gateway met none of the five criteria

set forth in the Solicitation, (2) that the five criteria are in any event an improper interpretation of the Independent Offices Appropriations Act, and (3) that Gateway's representations in response to the Solicitation were false and were known to the officials of GSA to be false when they arbitrarily, capriciously and unlawfully accepted Gateway's bid. Because the case was dismissed for lack of standing none of these issues were decided by the district court.[4]

### The Government's Position

On appeal the Government advances three arguments. First, it urges that congressional action since the award to Gateway has rendered this case moot. Next it urges that the district court correctly ruled that Merriam lacked standing. Finally, it urges that no statute has been violated by the award or would be violated by the proposed lease.

### The Mootness Contention

■ On July 13, 1972, Congress passed an appropriations act for certain independent agencies, including the GSA, for the fiscal year ending June 30, 1973. Pub.L. No. 92–351, 86 Stat. 471. If the building is finished before June 30, 1973, that act will apply to the initial rental payments. The 1973 appropriations act, like that of the year before, Pub.L. No. 92–49, 85 Stat. 108, omits the lease-construction prohibition upon which Merriam relies. This, the Government urges, makes Merriam's case moot, because the prohibition against payments contained in the Independent Offices Appropriations Acts for the previous nine years ceased prior to the execution of the Gateway lease.

The Government's contention must be read, however, in the light of another congressional action. In June of 1972,

---

projects costing over $200,000 has therefore been included in the bill. . . ." H.R.Rep. No. 2050, 87th Cong., 2d Sess. 13 (1962).

4. The district court does mention that in the event of a decision requiring new

bidding, if Gateway is permitted to rebid, the Government's strong preference for Gateway's site over that of Merriam would dictate its choice. Merriam, on the other hand, contends that Gateway should be disqualified from bidding because of its alleged fraud.

prior to the passage of the 1973 appropriations act on which the Government relies, Congress passed the Public Buildings Amendments of 1972. Pub.L. No. 92–313, 86 Stat. 216. Prior to these amendments, the Public Buildings Act of 1959, 40 U.S.C. §§ 601–615, had provided that in order to insure equitable distribution of public buildings throughout the United States, with limited exceptions, no appropriation for the construction or acquisition of a public building in excess of $100,000 would be made unless the construction or acquisition had first been approved by resolutions of the Committees on Public Works of the Senate and the House of Representatives. 40 U.S.C. § 606(a). This provision made no reference to leases on buildings to be constructed. To fill that obvious loophole, from 1963 through 1971 the Independent Offices Appropriations Acts contained the provision, upon which Merriam relies, that any lease for a building to be erected by the lessor must be submitted to the appropriate subcommittee in the same manner as, under the Public Buildings Act of 1959, for an acquisition or construction. Pub.L. No. 92–313 amended 40 U.S.C. § 606(a) by making it applicable not only to acquisition and construction but to leases. The amendment to § 606(a) differs in approach from that taken for nine years in the Independent Offices Appropriations Act in two respects. First, it applies § 606(a) to all leases, and not merely to leases for buildings to be erected by the lessor. Second, it makes § 606(a) applicable to leases depending upon the amount of annual rental ($500,000) rather than, as formerly, upon the cost of construction. The Act in relevant part now provides:

"No appropriation shall be made to lease any space at an average annual rental in excess of $500,000 for use for public purposes if such lease has not been approved by resolutions adopted by the Committee on Public Works of the Senate and House of Representatives, respectively. For the purposes of securing consideration for

such approval, the Administrator shall transmit to the Congress a prospectus of the proposed facility. . . ."

The Conference Report on that part of Pub.L. No. 92–313 states:

"This section amends section 7 of the Public Buildings Act of 1959 to require the Administrator of G.S.A. to submit a prospectus for approval by the House and Senate Public Works Committees whenever he proposes to secure leased space for which he proposes an average annual rental in excess of $500,000." Conf.Rep. No. 92–1097, 1972 U.S.Code Cong.&Ad.News, 92d Cong. 2d Sess. (Temp.Ed. No. 6) 2119.

The proposed Gateway lease involves annual rental far in excess of $500,000.00.

The Government's position is that since only an award to Gateway, not a lease with it, was made while the Independent Offices Appropriations Act, 1971 was in effect that Act has no application. Since only that statute, now expired, is referred to in the complaint, the case is moot.

■ Since the district court dismissed before Merriam had an opportunity to supplement his pleadings by reference to Pub.L. No. 92–313, the Government is technically correct that no reference is made to the later enactment. But equating the absence of a reference to the later enactment with mootness borders, we think, on the frivolous. We must, of course, take judicial notice of statutes applicable to the cause. 5 J. Moore, Federal Practice ¶ 43.09, at 1369 & n. 17 (2d ed. 1971). Merriam contends that the proposed lease would, without congressional approval, violate Pub.L. No. 92–313, and that the February 18, 1971 award to Gateway without congressional approval, violated the Independent Offices Appropriations Act, 1971. On the merits the Government contends that Pub.L. No. 92–313 is inapplicable and that the Independent Offices Appropriations Act, 1971 did not apply to, or at least did not bar, the

award. That controversy is very much alive.

### Standing

■ The district court recognized that Merriam, as an unsuccessful bidder, and as a landlord about to lose Government tenants to Gateway, having been deprived by an unlawful award to another of a potentially valuable business relationship with the Government, adequately met the amount in controversy requirement of 28 U.S.C. § 1331(a). The court recognized, as well, that the complaint set forth a present controversy arising under a law of the United States. It held, however, that in addition to a genuine controversy arising under the laws of the United States, pressed by a party asserting injury in fact to him, there was a separate standing requirement. Such standing, the court held, must be conferred by some federal statute which brings the party asserting the injury in fact within a protected zone of interest. The district court, in short, applied to the unsuccessful bidder on a federal contract the requirement that he be a Hohfeldian plaintiff. *See* W. Hohfeld, Fundamental Legal Conceptions as Applied in Judicial Reasoning I & II, 23 Yale L.J. 16 (1913), 26 Yale L.J. 710 (1917). It found no federal statute conferring a right of action. Therefore it dismissed the complaint. Chief reliance was placed upon Perkins v. Lukens Steel Co., 310 U.S. 113, 125, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) and Tennessee Electric Power Co. v. T.V.A., 306 U.S. 118, 137–138, 59 S. Ct. 366, 83 L.Ed. 543 (1939). Those cases, in turn, hark back to Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

In adopting this position, the district court rejected a settled line of authorities in the District of Columbia Circuit recognizing the standing of unsuccessful bidders on federal contracts, to which specific reference will be made shortly. These authorities were rejected on the ground that their analysis of Supreme Court authority since Perkins v. Lukens

Steel Co., *supra*, was tacitly rejected by the Court in the recent case of Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). We hold that Merriam, as a landlord about to lose government tenants and as an unsuccessful bidder, does have standing to seek judicial review of a government contract award.

■ In Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970) Judge Tamm made an extensive analysis of the issue whether an unsuccessful bidder on a federal government contract had standing to challenge an award. No purpose would be served by burnishing that analysis by repetition. It suffices to point out that he recognizes the substantial changes made, since the decision in Perkins v. Lukens Steel Co., *supra*, first by the Supreme Court in FCC v. Sanders Brother Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940) and Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), and next by Congress when it enacted Section 10 of the Administrative Procedure Act. 5 U.S.C. § 702. The holding in *Scanwell* is best set forth by a quotation:

> "The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a 'private attorney general'." 424 F.2d at 864.

Thus, a bidder who has suffered sufficient injury in fact to meet the case or controversy test of Article III may, in pursuit of a vindication of that injury, assert not only his own rights but those of the public. The District of Columbia Circuit still follows *Scanwell*. *See* Constructores Civiles de Centroamerica v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972); Wheelabrator Corp. v. Chafee, 147 U.S.App.D.C. 238, 455 F.2d 1306 (1971); M. Steinthal & Co. v. Sea-

mans, 147 U.S.App.D.C. 221, 455 F.2d 1289 (1971); Ballerina Pen Co. v. Kunzig, 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970), cert. denied, 401 U.S. 950, 91 S. Ct. 1186, 28 L.Ed.2d 234 (1971); Blackhawk Heating & Plumbing Co. v. Driver, 140 U.S.App.D.C. 31, 433 F.2d 1137 (1970).

■ Merriam meets the standing test adopted by the District of Columbia Circuit. Assuming for the moment, as the Government contends, that both the Independent Offices Appropriations Act and the Public Buildings Amendments of 1972 were designed to protect no zone of interest within which he falls, Merriam may nevertheless assert the public interest provided he has suffered injury in fact. In addition to the destruction of a present and a future potentially profitable relationship with the Government, an injury which the district court acknowledged, Merriam also suffered loss of the costs incurred in preparing and submitting his proposal. Such an injury has been recognized as compensable by the Court of Claims when an unsuccessful bidder seeks judicial review of an allegedly illegal award in that court. Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (1970). Bid preparation costs are not specifically alleged here, although under 28 U.S.C. § 1346(a)(2) the district court would have jurisdiction to consider such claims if less than $10,000. We mention the possibility of such a claim not to reject the district court's basis for finding the necessary allegation of injury in fact in the loss of a potentially profitable relationship, but to show that Merriam has suffered more than an intangible or speculative loss.

Thus, the district court's reliance, in rejecting Merriam's standing, upon Sierra Club v. Morton, *supra* is misplaced. That case is an application of the "injury in fact" test. That test requires "that the party seeking review be himself among the injured." 405 U.S. at 735, 92 S.Ct. at 1366. The Supreme Court's analysis in Sierra Club v. Mor-

ton is actually quite similar to that of Judge Tamm in *Scanwell*:

"Taken together, *Sanders* and *Scripps-Howard* thus established a dual proposition: the fact of economic injury is what gives a person standing to seek judicial review under the statute, but once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate." (footnote omitted) 405 U.S. at 737, 92 S.Ct. at 1367.

Sierra Club v. Morton rejects a construction of the Administrative Procedure Act which would recognize standing to seek judicial review in persons not having a direct stake in the outcome. But it recognizes that those, such as unsuccessful bidders, who do have such a direct stake, may assert not only their own interest, but that of the public at large. The *Sierra Club* holding in no way reflects upon the authorities in the District of Columbia Circuit which recognize the standing of an unsuccessful bidder.

■ The Government argues, however, that *Scanwell* and the cases following it are inconsistent with Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S. Ct. 827, 25 L.Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). These cases establish a dual test for judicial review of federal agency action. (1) The plaintiff must satisfy Article III by alleging injury in fact; (2) he must also establish that he falls within the zone of interest protected by the statute or regulation upon which he relies. Neither Merriam nor any other unsuccessful bidder, it is urged, can meet the second test, because all of the statutes or regulations with respect to government procurement are intended solely for the protection of the Government, and no one outside the Government falls within their zone of interest.

 We do not accept the Government's contention. Government procurement is usually made under the authority of the Armed Services Procurement Act of 1947, 10 U.S.C. §§ 2301–14 or the Federal Property and Administrative Services Act of 1949. 41 U.S.C. §§ 251–60. The latter statute applies to GSA. 41 U.S.C. § 252(a)(1). It sets forth procurement procedures both for contracts made after advertising for bids and for negotiated contracts. In this case the GSA advertised for bids. 41 U.S.C. § 253 provides:

"Whenever advertising is required—

(a) The advertisement for bids shall be made a sufficient time previous to the purchase or contract, and specifications and invitations for bids shall permit such full and free competition as is consistent with the procurement of types of property and services necessary to meet the requirements of the agency concerned. . . .

(b) All bids shall be publicly opened at the time and place stated in the advertisement. Award shall be made with reasonable promptness by written notice to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors considered: *Provided,* That all bids may be rejected when the agency head determines that it is in the public interest so to do." [5]

*Accord,* 10 U.S.C. § 2305(c), applicable to military procurement. It is noteworthy that 41 U.S.C. § 253(b) permits the rejection of all bids in the public interest, and permits the acceptance of any bid conforming to the invitation to bids found to be most advantageous to the Government, *but does not permit the acceptance of a bid not conforming to the invitation to bids.* This is consistent with the announced policy in 41 U.S.C. § 253(a) of drawing specifications and invitations which shall permit full and free competition. Patently the statute protects not only the Government's interest in securing advantageous contracts, but also the interests of those responding to the Government's invitation to do business with it.[6] Merriam, as a bidder, is within the zone of interest protected by the applicable procurement statute. *See* Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970); Superior Oil Co. v. Udall, 133 U.S.App.D.C. 198, 409 F.2d 1115 (D.C. Cir. 1969).[7]

 Any doubt that Congress intended that bidders be included within the zone of interest of the procurement statutes may be resolved, we think, by the interpretation of these statutes made by the General Accounting Office. That office is the agent of Congress in policing governmental expenditures. It has adopted regulations which expressly recognize the standing of unsuccessful bidders to challenge an award. 4 C.F.R. §§ 20.1–20.12. Indeed, the very solicitation here in issue was the subject of a proceeding in the General Accounting Office. No statute has made the GAO remedy exclusive, or its determination final.

---

5. There is nothing in the legislative history of this provision which indicates · that "property" does not include rental space. Originally the statute said "supplies", but this was changed by the 1952 amendments to the Federal Property and Administrative Services Act of 1949. Act of July 12, 1952, ch. 703, § 1(m), 66 Stat. 594; Sen. Rep. No. 2075, 1952 U.S.Code Cong. & Ad.News, 82d Cong. 2d Sess. 2121.

6. *But see* Lind v. Staats, 289 F.Supp. 182 (N.D.Cal.1968).

7. Even assuming that Merriam did not fall within a zone of interest protected by 41 U.S.C. § 253, we would be inclined to hold that his standing as a litigant should nevertheless be recognized. In a Hohfeldian sense a legal right can have its origin elsewhere than in a statute. When the Government solicits proposals to which bidders in good faith take the trouble to respond, the actual relationship between solicitor and bidder is not the same as before. The bidder has placed in the hands of the representatives of the Government the power to bind him to a contract. It is not too much to find a correlative obligation of fair dealing within the terms of the solicitation; an obligation sufficient to confer standing to enforce that obligation.

*Cf.* 5 U.S.C. §§ 551 et seq. It would be anomalous indeed if the courts declined to recognize the same zone of interest recognized by the General Accounting Office, the congressional agent. Whatever justification there may be for imposing, in addition to the case or controversy requirements of Article III, a zone of interest requirement for standing to seek judicial review of agency action, must be found in some notion of separation of powers. When the congressional agent interprets the governing procurement statutes as permitting review of executive agency action the separation of powers justification does not apply. There is, of course, the issue of harmful injunctive interference with executive branch decisions. But that problem is not one of standing, but of balancing the equities. *See* Page Communications Engineers, Inc. v. Resor, No. 24,784 (D.C. Cir., Dec. 4, 1970). There is, too, the issue of appropriate standards for judicial review of government contracting decisions. But again, that problem is not one of standing, but of developing standards of review for the varying factual situations likely to be presented. *See* A. G. Schoonmaker Co. v. Resor, 144 U.S.App.D.C. 250, 445 F.2d 726 (1971); Note, Judicial Review and Remedies for the Unsuccessful Bidder on Federal Government Contracts, 47 N.Y.U.L.Rev. 496 (1972). On the record before us neither issue is presented.

■■■ One other point should be mentioned. Merriam alleged injury not only to a prospective but to a present advantageous relationship with the Government. Some cases have recognized that such an existing relationship is sufficient to supply the missing "legal right" element thought to be necessary, in addition to injury in fact, before an unsuccessful bidder's standing would be recognized. *See* Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964); Copper Plumbing & Heating Co. v. Campbell, 110 U.S.App.D.C. 177, 290 F.2d 368 (1961). On this basis, too, Merriam may be considered to have met any dual test for standing which may be applicable.

We hold, then, that the district court erred in dismissing Merriam's claim for lack of standing.

## The Merits of the Claim

■■■ On this appeal the Government briefed only mootness and standing. At oral argument, however, government counsel urged that the district court judgment should be affirmed because it was in any event entitled to summary judgment. This contention was based upon the assertion that neither the Independent Offices Appropriations Act, 1971 nor the Public Buildings Amendments of 1972 applied to the disputed lease. We have referred above to the legislative background of both statutes. The Government's point with respect to the Independent Offices Appropriations Act is that since the lease with Gateway has not yet been executed and that statute has expired, execution of the lease now could not be a violation. Its point with respect to the Public Buildings Amendments of 1972 is that that statute was not intended to have retroactive application, either to leases already signed, or to agreements to make leases entered into prior to its effective date.

This sophisticated analysis, whereby the Gateway lease would simply slip through the cracks between the two statutes, misses the thrust of Merriam's complaint. When GSA prepared its solicitation for bids it said that the Independent Offices Appropriations Act applied, and that before approval of a lease for a new building could be made without congressional approval the offeror must meet five specified criteria. The award to Gateway is objected to not only because the lease was not submitted to Congress for approval, but also because the award without such approval is to a bidder who did not meet the advertised specifications. There is, as well, his contention that the award was fraudulent. The expiration of the Independent Offices Appropriations Act simply can-

not cure the agency's disregard of its own advertised specifications, or dispose of the fraud allegation. Thus, in rejecting the Government's contention that it is entitled to summary judgment we need not pass upon its sophisticated but dubious interpretation of the two statutes.

█ Finally, the Government urges that the proceeding before the General Accounting Office forecloses relief. As we pointed out above, that office ruled that Gateway did not meet the advertised specifications, but said it would not apply its ruling to existing leases. All that was before the district court, when its opinion was prepared was the text of the March 17, 1972 ruling by the General Accounting Office.[8] There is no way of telling, for example, whether the General Accounting Office was aware that the Government had agreed, in this case, that it would not execute the Gateway lease until construction was completed, thereby avoiding a decision on Merriam's preliminary injunction application. Certainly the present record is not ripe for summary judgment by an appellate court as to the propriety of the General Accounting Office ruling in such circumstances.

Moreover, it is the action of GSA of which Merriam seeks judicial review. In this recently developing area of law it is not yet clear what precise role the General Accounting Office will be held to play. See Wheelabrator Corp. v. Chafee, supra, 455 F.2d at 1313–1317. Possibly it will ultimately be found appropriate to impose on top of the procurement agency's procedures a rule requir-

ing exhaustion of administrative remedies available in the General Accounting Office.[9] Such a rule would postpone final judicial review until that agency acted on a bid protest, but might be coupled with the recognition that a federal court could preserve the status quo by a preliminary injunction in an appropriate case in the interim. Cf. 29 U.S.C. § 160(e). But such issues cannot be decided in a vacuum. The district court's decision dismissing for lack of standing left such a vacuum.

Our holding is limited to these propositions. (1) The case is not moot. (2) The plaintiff has standing to sue. (3) We cannot on the present record grant summary judgment to the Government. The judgment of the district court will be reversed and the cause remanded for further proceedings.

Before SEITZ, Chief Judge, VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN and HUNTER, Circuit Judges.

### OPINION ON PETITION FOR REHEARING

PER CURIAM:

█ The appellees in their petition for rehearing assert that the award of a contract to Gateway Center Corporation (Gateway) was a negotiated contract, and that statutory provisions relating to advertising for bids are irrelevant to such contracts. Throughout this case, until the petition for rehearing, the parties, the district court, and this court have treated the issues on the assumption that the plaintiff-appellant was a

---

8. The motion for summary judgment was argued on April 21, 1972. On April 25, 1972, after the argument but before the decision, the parties filed a stipulation making the March 17, 1972 ruling a part of the record. The district court opinion was filed on June 26, 1972. On that date a certificate of GAO was filed, to which is attached certain documents on file in that office in the Merriam bid protest procedure. The circumstances of the filing do not appear of record. The cer-

tificate does not establish that the documents attached comprise the entire GAO record. The district court opinion makes reference only to documents included in the record up to the date of the stipulation.

9. In the cases permitting suit, exhaustion of such administrative remedies has been disposed of by considering them inadequate or by deeming them essentially exhausted already. See 3 Gov't Cont.Rep. ¶ 24,095 at 12,044–45 (1972).

bidder who responded unsuccessfully to an advertisement for bids. The record establishes that there was an advertisement soliciting bids, and the defendants' moving papers refer repeatedly to acceptance of Gateway's bid. The General Accounting Office treated the dispute as one involving acceptance of a bid solicited by advertising. The procurement in question does not appear to fall within any exception to the general rule that "[a]ll purchases and contracts for property and services shall be made by advertising. . . ." 41 U.S.C. § 252 (c). The Armed Services Procurement Act, 10 U.S.C. § 2302(2), defines negotiate to mean a contract without formal advertising. The Federal Property and Administrative Services Act of 1949, 41 U.S.C. §§ 251–60, does not contain a definitions section, but 41 U.S.C. § 254(c) implies that negotiated contracts are those accomplished without advertising. Our holding is limited to a reversal of a grant of summary judgment, however, and does not foreclose the district court from considering a different theory of defense to the action on a different record if it deems that course to be proper. As was suggested in note 7 to the panel opinion, the district court must also consider whether Merriam may have standing even aside from the Federal Property and Administrative Services Act of 1949.

The petition for rehearing will be denied.

ADAMS, Circuit Judge (dissenting sur the denial of the petition for rehearing en banc):

In my view, this case raises two distinct legal problems: (1) whether the plaintiff has *standing* in the Article III sense; and (2) whether he has a substantive *legal claim* cognizable in a federal court. By combining the discussion of these two questions under the general heading "standing," the panel's opinion may well have obscured the significance of the second issue.

Under the title "standing," the panel first concludes that the plaintiff has suffered *injury* in fact.[1] The panel then proceeds, under the same heading, to consider whether the plaintiff is protected by (falls within the "zone of interest" of) the statute in question.[2] Noting that the statute *"does not permit the acceptance of a bid[2a] not conforming to the invitation to bids,"* the opinion concludes regarding the "zone of interest" issue:

"Patently the statute protects not only the Government's interest in securing advantageous contracts, but also the interests of those responding to the Government's invitation to do business with it. Merriam, as a bidder, is within the zone of interest protected by the applicable procurement statute." (footnotes and citations omitted).

I am not convinced that the plaintiff has satisfactorily demonstrated that *he* or any *interest* or *legal right* of his was intended by Congress to be protected by the statute in question. At the same time, a careful review of the relevant case law has persuaded me that the panel's analysis of the important issues presented in this appeal may lead to uncertainty in an area of the law already too well known for its lack of guidance.

For these reasons, and because of the effect the improper resolution of this second issue may be thought to have upon the role of federal courts in our system of government, I respectfully dissent from the Court's decision not to reconsider *en banc* this important aspect of the present appeal.

In view of the vast literature on the standing doctrine,[3] it would serve little

---

1. Slip op. at 1239–1241.

2. *Id.* at 1241.

2a. This dissenting opinion does not deal with the important issue whether the GSA

employed a procedure involving bidding as distinguished from negotiation.

3. *See, e. g.,* Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv. L.Rev. 645 (1973) ; Jaffe, Standing

purpose to repeat what others have already said, except to point out that the standing inquiry focuses upon whether the particular plaintiff "has a sufficient personal interest in getting the relief he seeks. . . ." [4] Putting that question to one side,[5] I am troubled by the panel's approach to determining whether Congress has revealed any interest in protecting a party such as this plaintiff.

When Congress has not explicitly provided in a given legislative enactment for judicial review of agency action either generally or at the behest of a particular class of litigants (i. e., private individuals), the question may arise whether one seeking to challenge the validity of an agency's action may do so in the courts despite the legislative silence.[6] Although this problem may not logically appear to raise a typical standing issue,[7]

Again, 84 Harv.L.Rev. 633 (1971); Davis, The Liberalized Law of Standing, 37 U.Chi.L.Rev. 450 (1970); Davis, Standing: Taxpayers and Others, 35 U. Chi.L.Rev. 601 (1968); Jaffe, The Citizen as Litigant in Public Actions; The Non-Hohfeldian or Ideological Plaintiff, 116 U.Pa.L.Rev. 1033 (1968).

4. H. Hart & H. Wechsler, The Federal Courts and The Federal System 174 (1953); see Flast v. Cohen, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968): "The question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable."

5. I am not inclined to dissent from the Court's decision not to reconsider whether the plaintiff has standing in an Article III sense. In addition, because I dissent here only from the decision of this Court denying the petition for rehearing en banc, I express at this time no views upon the merits of this case as a whole or upon the panel's *ultimate resolution* of the issue which this dissenting opinion addresses. This dissenting opinion deals only with the *approach* to the overall "standing question" which the panel has taken.

6. *See* Jaffe, Standing Again, 84 Harv.L. Rev. 633 (1971). Thus, a distinction must be made between those cases in which judicial review is sought of an act of a governmental agency which Congress has expressly made subject to review in the courts (statutory review) and those cases in which review is sought by means of a general jurisdictional grant (non-statutory review). *See* Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv.L.Rev. 645, 647–648 (1973); *compare, e. g.,* FCC v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940) (statutory review) *with, e. g.,* Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (non-statutory review). For examples of statutes expressly subjecting

agency action to judicial review, *see e. g.,* Federal Trade Commission Act, 15 U.S.C. § 45(c) (1970); Federal Power Act, 16 U.S.C. § 825*l*(b) (1970); Federal Aviation Act, 49 U.S.C. § 1486(a) (1970); Interstate Commerce Act, 49 U.S.C. § 1 (1970); National Labor Relations Act, 29 U.S.C. § 160(f) (1970); Securities Act of 1933, 15 U.S.C. § 77i(a) (1970); Investment Company Act of 1940, 15 U.S.C. § 80a–42(a) (1970); Federal Communications Act, 47 U.S.C. § 402(b) (6) (1970). The statutory and nonstatutory review situations must be separately analyzed because in the former Congress has expressed a policy that at least under some circumstances the agency's action shall be subject to judicial review, while in the latter a court does not have even that much guidance. In the present case, no relevant statute expressly provides for judicial review, and thus the plaintiff has sued under 28 U.S.C. § 1331 (federal question jurisdiction).

7. Courts frequently treat a host of different kinds of problems as raising standing issues. Familiar are cases involving (1) whether the plaintiff has in fact suffered injury, *see* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Flast v. Cohen, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); (2) whether a plaintiff may properly sue on the basis of another person's rights, *see* NAACP v. Alabama, 357 U.S. 449, 458, 78 S.Ct. 1163, 2 L.Ed. 2d 1488 (1958); Barrows v. Jackson, 346 U.S. 249, 255–259, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). The present case, on the other hand, concerns, apart from the Article III "injury in fact" issue, whether the plaintiff can establish the existence of a legal right which the GSA has allegedly violated. If he cannot so demonstrate, dismissal for failure to state a claim or cause of action is a more appropriate judicial response, in my view, than dismissal for lack of standing. The Supreme Court, however, has treated the problem as one of "standing," and, therefore, through-

courts have often sought to resolve it, under the standing rubric, by inquiring whether the plaintiff has a "legally protected interest" or "legal right." [8]

For example, in Tennessee Electric Power Company v. TVA [9] nineteen power companies attempted to attack the constitutional validity of the Tennessee Valley Authority. Despite the financial harm the plaintiffs had suffered, the Supreme Court concluded that they had no *right* derived from either common law or statute to be free from competition. To bring such a suit, the "right invaded [must be] a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." [10] As Justice Frankfurter later explained the doctrine in a different case:

> "A litigant ordinarily has standing to challenge governmental action of a sort that, if taken by a private person, would create a right of action cognizable by the courts . . . Or standing may be based on an interest created by the Constitution or a statute. . . . But if no comparable common law right exists and no such constitutional or statutory interest has been created, relief is not available judicially." [11]

Within two years of the *Tennessee Electric Power* decision, the Supreme Court journeyed into the area of determining what a plaintiff must show in order to satisfy the "legally protected interest" test. In FCC v. Sanders Brothers Radio Station,[12] an owner of a radio station sought judicial review of the grant of an operating license to an applicant. The Court held that the section of the Federal Communications Act permitting an appeal by any "person aggrieved or whose interests are adversely affected by any decision of the Commission" [13] provided standing for the plaintiff to challenge the grant of the license to its competitor. The Supreme Court did so, however, only (a) after examining the relevant legislative history [14] and (b) in view of the express provision in the statute for judicial review.

In 1968, the Supreme Court examined standing to challenge agency action in Hardin v. Kentucky Utilities Company.[15] In that case, a private power company sought review of the TVA's expansion of services into the complainant's market area by alleging that such expansion violated a statute.[16] Although the Tennessee Valley Authority Act contains no express provision for judicial review, the Supreme Court inspected the legislative history in order to determine whether the plaintiff could rely upon implied protection from the regulatory statute.[17] Inferring from the legislative history that the "primary purpose" of the stat-

out this opinion, I shall analyze it in the same terms. *See, e. g.,* Investment Co. Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed. 367 (1971) ; Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ; Perkins v. Lukens Steel, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940).

8. *See* Perkins v. Lukens Steel, 310 U.S. 113, 125, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) ; Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938).

9. 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939).

10. *Id.* at 137–138, 59 S.Ct. at 369.

11. Joint Anti-Facist Refugee Comm. v. McGrath, 341 U.S. 123, 152–153, 71 S.Ct.

624, 638, 95 L.Ed. 817 (Frankfurter, J., concurring).

12. 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940).

13. 47 U.S.C. § 402(b) (1964). It should be noted that in view of this provision *Sanders* should be analyzed as a statutory review case. *See* note 6, *supra.*

14. 309 U.S. at 476–477, 60 S.Ct. 693.

15. 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968).

16. Tennessee Valley Authority Act of 1933 § 15d(a), 16 U.S.C. § 831n–4(a) (1964) ; *see* U.S. at 3 n. 1.

17. 390 U.S. at 6–7, 88 S.Ct. 651.

ute was to benefit the plaintiff's interest, the Court held that such implicit congressional intent justified judicial review.

The Supreme Court has even more recently probed the requisites for judicial review of agency action. In Association of Data Processing Service Organizations v. Camp,[18] the Comptroller of the Currency issued a ruling permitting national banks to provide data-processing service to their customers. An association of companies offering computer services throughout the country filed suit challenging the ruling on the ground that the National Banking Act gives national banks only such "incidental powers as shall be necessary to carry on the business of banking. . . ."[19]

Examining the standing issue in two parts, the Supreme Court first concluded that the petitioners had suffered "injury in fact."[20] In the second part of its standing analysis, the Court proceeded to determine "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question."[21] Quoting from a First Circuit opinion[22] that

discussed the legislative history and purpose of § 4 of the Bank Service Corporation Act of 1962, prohibiting bank service corporations from engaging "in any activity other than the performance of bank services for banks,"[23] the Supreme Court held that "§ 4 arguably brings a competitor within the zone of interests protected by it."[24]

The critical issue here is essentially the same as the question presented in the cases discussed above: whether Congress, in enacting the statute or statutes involved, intended them to protect the interest asserted by the particular litigant in each case.[25] Placed in the factual setting of this appeal, that question becomes whether Congress intended to provide one seeking a government contract with judicial recourse when an alleged violation of that asserted interest by a federal administrative agency is set forth in a claim for judicial relief.

In grappling with this problem, it is not sufficient to hold merely that the plaintiff has standing to sue, since that holding may, in effect, say only that he has been injured in fact by the agency action of which he complains.[26] Rather,

18. 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed. 2d 184 (1970). For additional recent cases on the subject, see Investment Co. Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) (per curiam); Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L. Ed.2d 947 (1968).

19. 12 U.S.C. § 24 (seventh) (1970).

20. 397 U.S. at 152, 90 S.Ct. 827.

21. Id. at 153, 90 S.Ct. at 830.

22. Id. at 155, 90 S.Ct. 827, quoting Arnold Tours, Inc. v. Camp, 408 F.2d 1147, 1153 (1st Cir. 1969).

23. 12 U.S.C. § 1864 (1970).

24. 397 U.S. at 156, 90 S.Ct. at 831. The Court went on to discuss "whether judicial review of the Comptroller's action has been precluded," id. and held that it had not. Id. at 157, 90 S.Ct. 827. Justice Brennan disagreed with the *Data*

*Processing* majority's approach to the standing question, arguing that a plaintiff has standing if he has suffered "injury in fact," the Article III test. *See* Barlow v. Collins, 397 U.S. 159, 168, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring and dissenting). He would treat the reviewability of agency action question as a totally separate inquiry. *Id.* at 173, 90 S.Ct. 832.

25. *Compare* Investment Co. Institute v. Camp, 401 U.S. 617, 640, 91 S.Ct. 1091, 28 L.Ed.2d 367 (Harlan, J., dissenting); Barlow v. Collins, 397 U.S. 159, 174–175, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring and dissenting).

26. *Compare* Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (two-pronged standing test) *with* Barlow v. Collins, 397 U.S. 159, 170–173, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring and dissenting) (Article III standing test) *and* Flast v. Cohen, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

the Court must at some point, if the result reached is to conform to the tests fashioned by the Supreme Court, also hold that the plaintiff is protected by the statute in question, as illuminated by its legislative history, and that the statute permits him to seek judicial relief. Put simply, it is not enough for a plaintiff to come to a federal court and claim that he has been injured by action taken by a federal agency. Instead, he must also demonstrate that he has a cause of action to redress such injury—that he has a *right, enforceable in the federal courts,* not to be harmed by the agency's allegedly unlawful action.

As quoted above, *supra,* the panel states, and indeed holds, that Congress did intend for a private party, allegedly aggrieved by the action of the GSA, to be heard by a federal district court. What concerns me about such conclusion is that it is little more than just that—a conclusion not shown to be based, at least so far as the opinion reveals, upon the underlying purposes or legislative history of the statute.[27] In order to draw the inference that Congress intended for this kind of case to be heard by a federal court, I believe something more must be developed than the mere fact that the statute prohibits what the agency has allegedly done. What the panel has said still does not

adequately answer the question whether Congress intended to protect those, who like the plaintiff, are disappointed in not receiving a government contract, and to provide them with a private right of action in the district court.

To shirk the process of ascertaining legislative intent when a statute is silent, or at most ambiguous, under the empire of a belief that the result sought is beneficent, may prove unfruitful in the fullness of time.

In addition, I believe it appropriate to note that footnote 7 of the panel's opinion creates, at least for me, considerable conceptual misgivings. As developed above, in my view the plaintiff can properly sue, in the circumstances of this case, only if he can show that he has a cause of action under the statute in question. Suggesting that the Court might hold that, even assuming he is not within the zone of interest Congress intended to protect, he will be permitted to sue in any event seems to indicate that the Court is no longer following the standards laid down by the Supreme Court.[28] This step—constituting a considerable modification of the standards established by the Supreme Court—should be taken, if at all, only by the Court *en banc.*

While I agree that "[i]n Hohfeldian sense a legal right can have its origin elsewhere than in a statute,"[29] I per-

---

27. Although the Supreme Court may search for only slight evidence that Congress intended to protect a plaintiff's interests, it at least looks for some indicia. *See* Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 155, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Hardin v. Kentucky Utilities Co., 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). The Court of Appeals for the District of Columbia Circuit, which permits judicial review for those seeking to do business with the government, has done so only after examining the legislative history and purpose of the relevant statutes involved in each case. *See* Constructores Civiles de Centroamerica, S. A. v. Hannah, 148 U.S.App.D.C. 159, 459 F.2d 1183 (1972); Ballerina Pen Co. v. Kunzig, 140 U.S.App.D.C. 98, 433 F.2d 1204 (1970), cert. denied, 401 U.S. 950,

91 S.Ct. 1186, 28 L.Ed.2d 234 (1971); Scanwell Laboratories v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970).

28. *Id.; see* also Barlow v. Collins, 397 U.S. 159, 174–175, 90 S.Ct. 832, 25 L. Ed.2d 192 (Brennan, J., concurring and dissenting).

29. Panel opinion, n. 7. It should be noted that others, discussing the question whether to have standing a plaintiff must have Hohfeldian status, have done so only in the context of examining the minimum Article III standards. *See* Jaffe, The Citizen as Litigant in Public Actions: The Non-Hohfeldian or Ideological Plaintiff, 116 U.Pa.L.Rev. 1033 (1968). In a similar vein, Professor Scott has recently urged courts, while expanding "access standing," not to over-liberalize the standards for "decision standing." Scott,

ceive nothing in this case from which such a right might arise. True, as that footnote indicates, the government, if it receives a bid, does have the *power* to bind the bidder to a contract. Under Professor Hohfeld's analysis, however, a *duty* is correlative to a *right* not to a power. Imposing upon the government a *duty of fair dealing* must, then, have been suggested by the panel as a matter of *policy.* While such a policy may well be wise, it is not, in my view, one which a federal court should impose *sua sponte,* at least without guidance from Congress, and certainly not one for us to erect simply in order to provide disappointed contractors with a federal cause of action.

During the last few years the federal courts have experienced an extraordinary increase in volume far more than what ought to have been expected from population growth alone.[30] As Chief Judge Friendly has recently indicated in his excellent treatise on federal jurisdiction,[31] it may be that, if federal courts are to handle best the tasks most appropriately given them, a solution must be sought not by creating more judgeships, but by slowing up judicial intake and certainly not by staking out additional areas of jurisdiction without very

careful consideration. Apropos the present case, Chief Judge Friendly has said: "One need only consider the explosion of litigation under the SEC's Rule 10b–5, the proxy rules, and the new sections dealing with tender offers . . . to realize the impact that any such regulatory law can have once a right of private action is implied."[32]

Jurisdictional questions, like the one posed in this case, treated in isolation from the judicial system to which they relate, become, perhaps, sterile formalisms. But such underlying questions are matters of substance in the working of our federal system and in the effective conduct of the business of the courts.[33]

I am apprehensive that the effect of the panel's opinion may well be to deluge the federal courts with a host of grievances by disappointed contractors and perhaps by myriad other litigants allegedly injured by agency action they claim is in violation of some statute or rule. The Court should not lightly ascribe to Congress the intention to open new vistas of judicial review. And this, in my judgment, is precisely what the Court has done in this case.

For the above reasons, I dissent from the Court's decision not to reconsider this case en banc.

Standing in the Supreme Court—A Functional Analysis, 86 Harv.L.Rev. 645 (1973).

30. H. Friendly, Federal Jurisdiction: A General View 16 (Columbia Univ. Press 1973).

31. *Id.*

32. *Id.* at 110–111.

33. After a most exhaustive and scholarly functional treatment of the standing doctrine, Professor Scott concludes that: ". . . a predictable reaction [to the wholesale opening of federal court doors] will be a much stronger tendency for Congress to enact a variety of pre-

clusion provisions. The ultimate result of this kind of process is to push us to more all-or-nothing choices when it comes to judicial review, and that seems inherently undesirable.'

. . . . .

". . . But it would be regrettable if the erosion of access standing were thought to carry with it an automatic expansion of the policymaking role of the courts, for in that event the doors of the courts might come to be closed more often, not by judicial abdication, but by legislative fiat." Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv.L.Rev. 645, 689–690 (1973).